(Slip Opinion)     OCTOBER TERM, 2017     1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* HAWAII ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 17–965.   Argued April 25, 2018—Decided June 26, 2018

In September 2017, the President issued Proclamation No. 9645, seeking to improve vetting procedures for foreign nationals traveling to the United States by identifying ongoing deficiencies in the information needed to assess whether nationals of particular countries present a security threat. The Proclamation placed entry restrictions on the nationals of eight foreign states whose systems for managing and sharing information about their nationals the President deemed inadequate. Foreign states were selected for inclusion based on a review undertaken pursuant to one of the President's earlier Executive Orders. As part of that review, the Department of Homeland Security (DHS), in consultation with the State Department and intelligence agencies, developed an information and risk assessment "baseline." DHS then collected and evaluated data for all foreign governments, identifying those having deficient information-sharing practices and presenting national security concerns, as well as other countries "at risk" of failing to meet the baseline. After a 50-day period during which the State Department made diplomatic efforts to encourage foreign governments to improve their practices, the Acting Secretary of Homeland Security concluded that eight countries—Chad, Iran, Iraq, Libya, North Korea, Syria, Venezuela, and Yemen—remained deficient. She recommended entry restrictions for certain nationals from all of those countries but Iraq, which had a close cooperative relationship with the U. S. She also recommended including Somalia, which met the information-sharing component of the baseline standards but had other special risk factors, such as a significant terrorist presence. After consulting with multiple Cabinet members, the President adopted the recommendations and issued the Proclamation.

Invoking his authority under 8 U. S. C. §§1182(f) and 1185(a), he determined that certain restrictions were necessary to "prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information" and "elicit improved identity-management and information-sharing protocols and practices from foreign governments." The Proclamation imposes a range of entry restrictions that vary based on the "distinct circumstances" in each of the eight countries. It exempts lawful permanent residents and provides case-by-case waivers under certain circumstances. It also directs DHS to assess on a continuing basis whether the restrictions should be modified or continued, and to report to the President every 180 days. At the completion of the first such review period, the President determined that Chad had sufficiently improved its practices, and he accordingly lifted restrictions on its nationals.

Plaintiffs—the State of Hawaii, three individuals with foreign relatives affected by the entry suspension, and the Muslim Association of Hawaii—argue that the Proclamation violates the Immigration and Nationality Act (INA) and the Establishment Clause. The District Court granted a nationwide preliminary injunction barring enforcement of the restrictions. The Ninth Circuit affirmed, concluding that the Proclamation contravened two provisions of the INA: §1182(f), which authorizes the President to "suspend the entry of all aliens or any class of aliens" whenever he "finds" that their entry "would be detrimental to the interests of the United States," and §1152(a)(1)(A), which provides that "no person shall . . . be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." The court did not reach the Establishment Clause claim.

*Held*:

1. This Court assumes without deciding that plaintiffs' statutory claims are reviewable, notwithstanding consular nonreviewability or any other statutory nonreviewability issue. See *Sale* v. *Haitian Centers Council, Inc.*, 509 U. S. 155. Pp. 8–9.

2. The President has lawfully exercised the broad discretion granted to him under §1182(f) to suspend the entry of aliens into the United States. Pp. 9–24.

(a) By its terms, §1182(f) exudes deference to the President in every clause. It entrusts to the President the decisions whether and when to suspend entry, whose entry to suspend, for how long, and on what conditions. It thus vests the President with "ample power" to impose entry restrictions in addition to those elsewhere enumerated in the INA. *Sale*, 509 U. S., at 187. The Proclamation falls within this comprehensive delegation. The sole prerequisite set forth in §1182(f) is that the President "find[ ]" that the entry of the covered al-

iens "would be detrimental to the interests of the United States." The President has undoubtedly fulfilled that requirement here. He first ordered DHS and other agencies to conduct a comprehensive evaluation of every single country's compliance with the information and risk assessment baseline. He then issued a Proclamation with extensive findings about the deficiencies and their impact. Based on that review, he found that restricting entry of aliens who could not be vetted with adequate information was in the national interest.

Even assuming that some form of inquiry into the persuasiveness of the President's findings is appropriate, but see *Webster* v. *Doe*, 486 U. S. 592, 600, plaintiffs' attacks on the sufficiency of the findings cannot be sustained. The 12-page Proclamation is more detailed than any prior order issued under §1182(f). And such a searching inquiry is inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere. See, *e.g., Sale*, 509 U. S., at 187–188.

The Proclamation comports with the remaining textual limits in §1182(f). While the word "suspend" often connotes a temporary deferral, the President is not required to prescribe in advance a fixed end date for the entry restriction. Like its predecessors, the Proclamation makes clear that its "conditional restrictions" will remain in force only so long as necessary to "address" the identified "inadequacies and risks" within the covered nations. Finally, the Proclamation properly identifies a "class of aliens" whose entry is suspended, and the word "class" comfortably encompasses a group of people linked by nationality. Pp. 10–15.

(b) Plaintiffs have not identified any conflict between the Proclamation and the immigration scheme reflected in the INA that would implicitly bar the President from addressing deficiencies in the Nation's vetting system. The existing grounds of inadmissibility and the narrow Visa Waiver Program do not address the failure of certain high-risk countries to provide a minimum baseline of reliable information. Further, neither the legislative history of §1182(f) nor historical practice justifies departing from the clear text of the statute. Pp. 15–20.

(c) Plaintiffs' argument that the President's entry suspension violates §1152(a)(1)(A) ignores the basic distinction between admissibility determinations and visa issuance that runs throughout the INA. Section 1182 defines the universe of aliens who are admissible into the United States (and therefore eligible to receive a visa). Once §1182 sets the boundaries of admissibility, §1152(a)(1)(A) prohibits discrimination in the allocation of immigrant visas based on nationality and other traits. Had Congress intended in §1152(a)(1)(A) to constrain the President's power to determine who may enter the country,

it could have chosen language directed to that end. Common sense and historical practice confirm that §1152(a)(1)(A) does not limit the President's delegated authority under §1182(f). Presidents have repeatedly exercised their authority to suspend entry on the basis of nationality. And on plaintiffs' reading, the President would not be permitted to suspend entry from particular foreign states in response to an epidemic, or even if the United States were on the brink of war. Pp. 20–24.

3. Plaintiffs have not demonstrated a likelihood of success on the merits of their claim that the Proclamation violates the Establishment Clause. Pp. 24–38.

(a) The individual plaintiffs have Article III standing to challenge the exclusion of their relatives under the Establishment Clause. A person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact. Cf., *e.g., Kerry* v. *Din*, 576 U. S. ___, ___. Pp. 24–26.

(b) Plaintiffs allege that the primary purpose of the Proclamation was religious animus and that the President's stated concerns about vetting protocols and national security were but pretexts for discriminating against Muslims. At the heart of their case is a series of statements by the President and his advisers both during the campaign and since the President assumed office. The issue, however, is not whether to denounce the President's statements, but the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility. In doing so, the Court must consider not only the statements of a particular President, but also the authority of the Presidency itself. Pp. 26–29.

(c) The admission and exclusion of foreign nationals is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo* v. *Bell*, 430 U. S. 787, 792. Although foreign nationals seeking admission have no constitutional right to entry, this Court has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U. S. citizen. That review is limited to whether the Executive gives a "facially legitimate and bona fide" reason for its action, *Kleindienst* v. *Mandel*, 408 U. S. 753, 769, but the Court need not define the precise contours of that narrow inquiry in this case. For today's purposes, the Court assumes that it may look behind the face of the Proclamation to the extent of applying rational basis review, *i.e.,* whether the entry policy is plausibly related to the Government's stated objective to protect the country and improve vetting processes. Plaintiffs' extrinsic evidence may be considered, but the policy will be upheld so long as it can reasonably

be understood to result from a justification independent of unconstitutional grounds. Pp. 30–32.

(d) On the few occasions where the Court has struck down a policy as illegitimate under rational basis scrutiny, a common thread has been that the laws at issue were "divorced from any factual context from which [the Court] could discern a relationship to legitimate state interests*." Romer* v. *Evans*, 517 U. S. 620, 635. The Proclamation does not fit that pattern. It is expressly premised on legitimate purposes and says nothing about religion. The entry restrictions on Muslim-majority nations are limited to countries that were previously designated by Congress or prior administrations as posing national security risks. Moreover, the Proclamation reflects the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies. Plaintiffs challenge the entry suspension based on their perception of its effectiveness and wisdom, but the Court cannot substitute its own assessment for the Executive's predictive judgments on such matters. See *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 33–34.

Three additional features of the entry policy support the Government's claim of a legitimate national security interest. First, since the President introduced entry restrictions in January 2017, three Muslim-majority countries—Iraq, Sudan, and Chad—have been removed from the list. Second, for those countries still subject to entry restrictions, the Proclamation includes numerous exceptions for various categories of foreign nationals. Finally, the Proclamation creates a waiver program open to all covered foreign nationals seeking entry as immigrants or nonimmigrants. Under these circumstances, the Government has set forth a sufficient national security justification to survive rational basis review. Pp. 33–38.

878 F. 3d 662, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY, THOMAS, ALITO, and GORSUCH, JJ., joined. KENNEDY, J., and THOMAS, J., filed concurring opinions. BREYER, J., filed a dissenting opinion, in which KAGAN, J., joined. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

—————

No. 17–965

—————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* HAWAII, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 26, 2018]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Under the Immigration and Nationality Act, foreign nationals seeking entry into the United States undergo a vetting process to ensure that they satisfy the numerous requirements for admission. The Act also vests the President with authority to restrict the entry of aliens whenever he finds that their entry "would be detrimental to the interests of the United States." 8 U. S. C. §1182(f). Relying on that delegation, the President concluded that it was necessary to impose entry restrictions on nationals of countries that do not share adequate information for an informed entry determination, or that otherwise present national security risks. Presidential Proclamation No. 9645, 82 Fed. Reg. 45161 (2017) (Proclamation). The plaintiffs in this litigation, respondents here, challenged the application of those entry restrictions to certain aliens abroad. We now decide whether the President had authority under the Act to issue the Proclamation, and whether the entry policy violates the Establishment Clause of the First Amendment.

I

A

Shortly after taking office, President Trump signed
Executive Order No. 13769, Protecting the Nation From
Foreign Terrorist Entry Into the United States. 82 Fed.
Reg. 8977 (2017) (EO–1). EO–1 directed the Secretary of
Homeland Security to conduct a review to examine the
adequacy of information provided by foreign governments
about their nationals seeking to enter the United States.
§3(a). Pending that review, the order suspended for 90
days the entry of foreign nationals from seven countries—
Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen—
that had been previously identified by Congress or prior
administrations as posing heightened terrorism risks.
§3(c). The District Court for the Western District of Wash-
ington entered a temporary restraining order blocking the
entry restrictions, and the Court of Appeals for the Ninth
Circuit denied the Government's request to stay that
order. *Washington* v. *Trump*, 847 F. 3d 1151 (2017) (*per
curiam*).

In response, the President revoked EO–1, replacing it
with Executive Order No. 13780, which again directed a
worldwide review. 82 Fed. Reg. 13209 (2017) (EO–2).
Citing investigative burdens on agencies and the need to
diminish the risk that dangerous individuals would enter
without adequate vetting, EO–2 also temporarily restricted
the entry (with case-by-case waivers) of foreign nationals
from six of the countries covered by EO–1: Iran, Libya,
Somalia, Sudan, Syria, and Yemen. §§2(c), 3(a). The
order explained that those countries had been selected
because each "is a state sponsor of terrorism, has been
significantly compromised by terrorist organizations, or
contains active conflict zones." §1(d). The entry re-
striction was to stay in effect for 90 days, pending comple-
tion of the worldwide review.

These interim measures were immediately challenged in

court. The District Courts for the Districts of Maryland and Hawaii entered nationwide preliminary injunctions barring enforcement of the entry suspension, and the respective Courts of Appeals upheld those injunctions, albeit on different grounds. *International Refugee Assistance Project* (*IRAP*) v. *Trump*, 857 F. 3d 554 (CA4 2017); *Hawaii* v. *Trump*, 859 F. 3d 741 (CA9 2017) (*per curiam*). This Court granted certiorari and stayed the injunctions— allowing the entry suspension to go into effect—with respect to foreign nationals who lacked a "credible claim of a bona fide relationship" with a person or entity in the United States. *Trump* v. *IRAP*, 582 U. S. ___, ___ (2017) (*per curiam*) (slip op., at 12). The temporary restrictions in EO–2 expired before this Court took any action, and we vacated the lower court decisions as moot. *Trump* v. *IRAP*, 583 U. S. ___ (2017); *Trump* v. *Hawaii*, 583 U. S. ___ (2017).

On September 24, 2017, after completion of the worldwide review, the President issued the Proclamation before us—Proclamation No. 9645, Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats. 82 Fed. Reg. 45161. The Proclamation (as its title indicates) sought to improve vetting procedures by identifying ongoing deficiencies in the information needed to assess whether nationals of particular countries present "public safety threats." §1(a). To further that purpose, the Proclamation placed entry restrictions on the nationals of eight foreign states whose systems for managing and sharing information about their nationals the President deemed inadequate.

The Proclamation described how foreign states were selected for inclusion based on the review undertaken pursuant to EO–2. As part of that review, the Department of Homeland Security (DHS), in consultation with the State Department and several intelligence agencies,

developed a "baseline" for the information required from foreign governments to confirm the identity of individuals seeking entry into the United States, and to determine whether those individuals pose a security threat. §1(c). The baseline included three components. The first, "identity-management information," focused on whether a foreign government ensures the integrity of travel documents by issuing electronic passports, reporting lost or stolen passports, and making available additional identity-related information. Second, the agencies considered the extent to which the country discloses information on criminal history and suspected terrorist links, provides travel document exemplars, and facilitates the U. S. Government's receipt of information about airline passengers and crews traveling to the United States. Finally, the agencies weighed various indicators of national security risk, including whether the foreign state is a known or potential terrorist safe haven and whether it regularly declines to receive returning nationals following final orders of removal from the United States. *Ibid.*

DHS collected and evaluated data regarding all foreign governments. §1(d). It identified 16 countries as having deficient information-sharing practices and presenting national security concerns, and another 31 countries as "at risk" of similarly failing to meet the baseline. §1(e). The State Department then undertook diplomatic efforts over a 50-day period to encourage all foreign governments to improve their practices. §1(f). As a result of that effort, numerous countries provided DHS with travel document exemplars and agreed to share information on known or suspected terrorists. *Ibid.*

Following the 50-day period, the Acting Secretary of Homeland Security concluded that eight countries—Chad, Iran, Iraq, Libya, North Korea, Syria, Venezuela, and Yemen—remained deficient in terms of their risk profile and willingness to provide requested information. The

Acting Secretary recommended that the President impose entry restrictions on certain nationals from all of those countries except Iraq. §§1(g), (h). She also concluded that although Somalia generally satisfied the information-sharing component of the baseline standards, its "identity-management deficiencies" and "significant terrorist presence" presented special circumstances justifying additional limitations. She therefore recommended entry limitations for certain nationals of that country. §1(i). As for Iraq, the Acting Secretary found that entry limitations on its nationals were not warranted given the close cooperative relationship between the U. S. and Iraqi Governments and Iraq's commitment to combating ISIS. §1(g).

After consulting with multiple Cabinet members and other officials, the President adopted the Acting Secretary's recommendations and issued the Proclamation. Invoking his authority under 8 U. S. C. §§1182(f) and 1185(a), the President determined that certain entry restrictions were necessary to "prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information"; "elicit improved identity-management and information-sharing protocols and practices from foreign governments"; and otherwise "advance [the] foreign policy, national security, and counter-terrorism objectives" of the United States. Proclamation §1(h). The President explained that these restrictions would be the "most likely to encourage cooperation" while "protect[ing] the United States until such time as improvements occur." *Ibid.*

The Proclamation imposed a range of restrictions that vary based on the "distinct circumstances" in each of the eight countries. *Ibid.* For countries that do not cooperate with the United States in identifying security risks (Iran, North Korea, and Syria), the Proclamation suspends entry of all nationals, except for Iranians seeking nonimmigrant student and exchange-visitor visas. §§2(b)(ii), (d)(ii),

(e)(ii). For countries that have information-sharing defi-
ciencies but are nonetheless "valuable counterterrorism
partner[s]" (Chad, Libya, and Yemen), it restricts entry of
nationals seeking immigrant visas and nonimmigrant
business or tourist visas. §§2(a)(i), (c)(i), (g)(i). Because
Somalia generally satisfies the baseline standards but was
found to present special risk factors, the Proclamation
suspends entry of nationals seeking immigrant visas and
requires additional scrutiny of nationals seeking nonim-
migrant visas. §2(h)(ii). And for Venezuela, which refuses
to cooperate in information sharing but for which alterna-
tive means are available to identify its nationals, the
Proclamation limits entry only of certain government
officials and their family members on nonimmigrant busi-
ness or tourist visas. §2(f)(ii).

The Proclamation exempts lawful permanent residents
and foreign nationals who have been granted asylum.
§3(b). It also provides for case-by-case waivers when a
foreign national demonstrates undue hardship, and that
his entry is in the national interest and would not pose a
threat to public safety. §3(c)(i); see also §3(c)(iv) (listing
examples of when a waiver might be appropriate, such as
if the foreign national seeks to reside with a close family
member, obtain urgent medical care, or pursue significant
business obligations). The Proclamation further directs
DHS to assess on a continuing basis whether entry re-
strictions should be modified or continued, and to report to
the President every 180 days. §4. Upon completion of the
first such review period, the President, on the recommen-
dation of the Secretary of Homeland Security, determined
that Chad had sufficiently improved its practices, and he
accordingly lifted restrictions on its nationals. Presiden-
tial Proclamation No. 9723, 83 Fed. Reg. 15937 (2018).

B

Plaintiffs in this case are the State of Hawaii, three

individuals (Dr. Ismail Elshikh, John Doe #1, and John Doe #2), and the Muslim Association of Hawaii. The State operates the University of Hawaii system, which recruits students and faculty from the designated countries. The three individual plaintiffs are U. S. citizens or lawful permanent residents who have relatives from Iran, Syria, and Yemen applying for immigrant or nonimmigrant visas. The Association is a nonprofit organization that operates a mosque in Hawaii.

Plaintiffs challenged the Proclamation—except as applied to North Korea and Venezuela—on several grounds. As relevant here, they argued that the Proclamation contravenes provisions in the Immigration and Nationality Act (INA), 66 Stat. 187, as amended. Plaintiffs further claimed that the Proclamation violates the Establishment Clause of the First Amendment, because it was motivated not by concerns pertaining to national security but by animus toward Islam.

The District Court granted a nationwide preliminary injunction barring enforcement of the entry restrictions. The court concluded that the Proclamation violated two provisions of the INA: §1182(f), because the President did not make sufficient findings that the entry of the covered foreign nationals would be detrimental to the national interest, and §1152(a)(1)(A), because the policy discriminates against immigrant visa applicants on the basis of nationality. 265 F. Supp. 3d 1140, 1155–1159 (Haw. 2017). The Government requested expedited briefing and sought a stay pending appeal. The Court of Appeals for the Ninth Circuit granted a partial stay, permitting enforcement of the Proclamation with respect to foreign nationals who lack a bona fide relationship with the United States. This Court then stayed the injunction in full pending disposition of the Government's appeal. 583 U. S. \_\_\_ (2017).

The Court of Appeals affirmed. The court first held that

the Proclamation exceeds the President's authority under §1182(f). In its view, that provision authorizes only a "temporary" suspension of entry in response to "exigencies" that "Congress would be ill-equipped to address." 878 F. 3d 662, 684, 688 (2017). The court further reasoned that the Proclamation "conflicts with the INA's finely reticulated regulatory scheme" by addressing "matters of immigration already passed upon by Congress." *Id.*, at 685, 690. The Ninth Circuit then turned to §1152(a)(1)(A) and determined that the entry restrictions also contravene the prohibition on nationality-based discrimination in the issuance of immigrant visas. The court did not reach plaintiffs' Establishment Clause claim.

We granted certiorari. 583 U. S. ___ (2018).

## II

Before addressing the merits of plaintiffs' statutory claims, we consider whether we have authority to do so. The Government argues that plaintiffs' challenge to the Proclamation under the INA is not justiciable. Relying on the doctrine of consular nonreviewability, the Government contends that because aliens have no "claim of right" to enter the United States, and because exclusion of aliens is "a fundamental act of sovereignty" by the political branches, review of an exclusion decision "is not within the province of any court, unless expressly authorized by law." *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 542–543 (1950). According to the Government, that principle barring review is reflected in the INA, which sets forth a comprehensive framework for review of orders of removal, but authorizes judicial review only for aliens physically present in the United States. See Brief for Petitioners 19–20 (citing 8 U. S. C. §1252).

The justiciability of plaintiffs' challenge under the INA presents a difficult question. The Government made similar arguments that no judicial review was available in

*Sale* v. *Haitian Centers Council, Inc.*, 509 U. S. 155 (1993). The Court in that case, however, went on to consider on the merits a statutory claim like the one before us without addressing the issue of reviewability. The Government does not argue that the doctrine of consular nonreviewability goes to the Court's jurisdiction, see Tr. of Oral Arg. 13, nor does it point to any provision of the INA that expressly strips the Court of jurisdiction over plaintiffs' claims, see *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. 145, 153 (2013) (requiring Congress to "clearly state[]" that a statutory provision is jurisdictional). As a result, we may assume without deciding that plaintiffs' statutory claims are reviewable, notwithstanding consular nonreviewability or any other statutory nonreviewability issue, and we proceed on that basis.

### III

The INA establishes numerous grounds on which an alien abroad may be inadmissible to the United States and ineligible for a visa. See, *e.g.,* 8 U. S. C. §§1182(a)(1) (health-related grounds), (a)(2) (criminal history), (a)(3)(B) (terrorist activities), (a)(3)(C) (foreign policy grounds). Congress has also delegated to the President authority to suspend or restrict the entry of aliens in certain circumstances. The principal source of that authority, §1182(f), enables the President to "suspend the entry of all aliens or any class of aliens" whenever he "finds" that their entry "would be detrimental to the interests of the United States."[1]

—————

[1] The President also invoked his power under 8 U. S. C. §1185(a)(1), which grants the President authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." Because this provision "substantially overlap[s]" with §1182(f), we agree with the Government that we "need not resolve . . . the precise relationship between the two statutes" in evaluating the validity of the Proclama-

Plaintiffs argue that the Proclamation is not a valid exercise of the President's authority under the INA. In their view, §1182(f) confers only a residual power to temporarily halt the entry of a discrete group of aliens engaged in harmful conduct. They also assert that the Proclamation violates another provision of the INA—8 U. S. C. §1152(a)(1)(A)—because it discriminates on the basis of nationality in the issuance of immigrant visas.

By its plain language, §1182(f) grants the President broad discretion to suspend the entry of aliens into the United States. The President lawfully exercised that discretion based on his findings—following a worldwide, multi-agency review—that entry of the covered aliens would be detrimental to the national interest. And plaintiffs' attempts to identify a conflict with other provisions in the INA, and their appeal to the statute's purposes and legislative history, fail to overcome the clear statutory language.

A

The text of §1182(f) states:

"Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."

By its terms, §1182(f) exudes deference to the President in every clause. It entrusts to the President the decisions whether and when to suspend entry ("[w]henever [he] finds that the entry" of aliens "would be detrimental" to

——————
tion. Brief for Petitioners 32–33.

the national interest); whose entry to suspend ("all aliens or any class of aliens"); for how long ("for such period as he shall deem necessary"); and on what conditions ("any restrictions he may deem to be appropriate"). It is therefore unsurprising that we have previously observed that §1182(f) vests the President with "ample power" to impose entry restrictions in addition to those elsewhere enumerated in the INA. *Sale*, 509 U. S., at 187 (finding it "perfectly clear" that the President could "establish a naval blockade" to prevent illegal migrants from entering the United States); see also *Abourezk* v. *Reagan*, 785 F. 2d 1043, 1049, n. 2 (CADC 1986) (describing the "sweeping proclamation power" in §1182(f) as enabling the President to supplement the other grounds of inadmissibility in the INA).

The Proclamation falls well within this comprehensive delegation. The sole prerequisite set forth in §1182(f) is that the President "find[]" that the entry of the covered aliens "would be detrimental to the interests of the United States." The President has undoubtedly fulfilled that requirement here. He first ordered DHS and other agencies to conduct a comprehensive evaluation of every single country's compliance with the information and risk assessment baseline. The President then issued a Proclamation setting forth extensive findings describing how deficiencies in the practices of select foreign governments— several of which are state sponsors of terrorism—deprive the Government of "sufficient information to assess the risks [those countries' nationals] pose to the United States." Proclamation §1(h)(i). Based on that review, the President found that it was in the national interest to restrict entry of aliens who could not be vetted with adequate information—both to protect national security and public safety, and to induce improvement by their home countries. The Proclamation therefore "craft[ed] . . . country-specific restrictions that would be most likely to

encourage cooperation given each country's distinct cir-
cumstances," while securing the Nation "until such time
as improvements occur." *Ibid.*[2]

Plaintiffs believe that these findings are insufficient.
They argue, as an initial matter, that the Proclamation
fails to provide a persuasive rationale for why nationality
alone renders the covered foreign nationals a security risk.
And they further discount the President's stated concern
about deficient vetting because the Proclamation allows
many aliens from the designated countries to enter on
nonimmigrant visas.

Such arguments are grounded on the premise that
§1182(f) not only requires the President to *make* a finding
that entry "would be detrimental to the interests of the
United States," but also to explain that finding with suffi-
cient detail to enable judicial review. That premise is
questionable. See *Webster* v. *Doe*, 486 U. S. 592, 600
(1988) (concluding that a statute authorizing the CIA
Director to terminate an employee when the Director
"shall deem such termination necessary or advisable in
the interests of the United States" forecloses "any mean-
ingful judicial standard of review"). But even assuming
that some form of review is appropriate, plaintiffs' attacks
on the sufficiency of the President's findings cannot be
sustained. The 12-page Proclamation—which thoroughly
describes the process, agency evaluations, and recommen-
dations underlying the President's chosen restrictions—is
more detailed than any prior order a President has issued
under §1182(f). Contrast Presidential Proclamation No.
6958, 3 CFR 133 (1996) (President Clinton) (explaining in
one sentence why suspending entry of members of the

---

[2] The Proclamation states that it does not disclose every ground for
the country-specific restrictions because "[d]escribing all of those
reasons publicly . . . would cause serious damage to the national security
of the United States, and many such descriptions are classified." §1(j).

Sudanese government and armed forces "is in the foreign policy interests of the United States"); Presidential Proclamation No. 4865, 3 CFR 50–51 (1981) (President Reagan) (explaining in five sentences why measures to curtail "the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States" are "necessary").

Moreover, plaintiffs' request for a searching inquiry into the persuasiveness of the President's justifications is inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere. "Whether the President's chosen method" of addressing perceived risks is justified from a policy perspective is "irrelevant to the scope of his [§1182(f)] authority." *Sale*, 509 U. S., at 187–188. And when the President adopts "a preventive measure . . . in the context of international affairs and national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions." *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 35 (2010).

The Proclamation also comports with the remaining textual limits in §1182(f). We agree with plaintiffs that the word "suspend" often connotes a "defer[ral] till later," Webster's Third New International Dictionary 2303 (1966). But that does not mean that the President is required to prescribe in advance a fixed end date for the entry restrictions. Section 1182(f) authorizes the President to suspend entry "for such period as he shall deem necessary." It follows that when a President suspends entry in response to a diplomatic dispute or policy concern, he may link the duration of those restrictions, implicitly or explicitly, to the resolution of the triggering condition. See, *e.g.,* Presidential Proclamation No. 5829, 3 CFR 88 (1988) (President Reagan) (suspending the entry of certain Panamanian nationals "until such time as . . . democracy has been restored in Panama"); Presidential Proclamation

No. 8693, 3 CFR 86–87 (2011) (President Obama) (suspending the entry of individuals subject to a travel restriction under United Nations Security Council resolutions "until such time as the Secretary of State determines that [the suspension] is no longer necessary"). In fact, not one of the 43 suspension orders issued prior to this litigation has specified a precise end date.

Like its predecessors, the Proclamation makes clear that its "conditional restrictions" will remain in force only so long as necessary to "address" the identified "inadequacies and risks" within the covered nations. Proclamation Preamble, and §1(h); see *ibid.* (explaining that the aim is to "relax[] or remove[]" the entry restrictions "as soon as possible"). To that end, the Proclamation establishes an ongoing process to engage covered nations and assess every 180 days whether the entry restrictions should be modified or terminated. §§4(a), (b). Indeed, after the initial review period, the President determined that Chad had made sufficient improvements to its identity-management protocols, and he accordingly lifted the entry suspension on its nationals. See Proclamation No. 9723, 83 Fed. Reg. 15937.

Finally, the Proclamation properly identifies a "class of aliens"—nationals of select countries—whose entry is suspended. Plaintiffs argue that "class" must refer to a well-defined group of individuals who share a common "characteristic" apart from nationality. Brief for Respondents 42. But the text of §1182(f), of course, does not say that, and the word "class" comfortably encompasses a group of people linked by nationality. Plaintiffs also contend that the class cannot be "overbroad." Brief for Respondents 42. But that simply amounts to an unspoken tailoring requirement found nowhere in Congress's grant of authority to suspend entry of not only "any class of aliens" but "all aliens."

In short, the language of §1182(f) is clear, and the Proc-

lamation does not exceed any textual limit on the President's authority.

### B

Confronted with this "facially broad grant of power," 878 F. 3d, at 688, plaintiffs focus their attention on statutory structure and legislative purpose. They seek support in, first, the immigration scheme reflected in the INA as a whole, and, second, the legislative history of §1182(f) and historical practice. Neither argument justifies departing from the clear text of the statute.

### 1

Plaintiffs' structural argument starts with the premise that §1182(f) does not give the President authority to countermand Congress's considered policy judgments. The President, they say, may supplement the INA, but he cannot supplant it. And in their view, the Proclamation falls in the latter category because Congress has already specified a two-part solution to the problem of aliens seeking entry from countries that do not share sufficient information with the United States. First, Congress designed an individualized vetting system that places the burden on the alien to prove his admissibility. See §1361. Second, instead of banning the entry of nationals from particular countries, Congress sought to encourage information sharing through a Visa Waiver Program offering fast-track admission for countries that cooperate with the United States. See §1187.

We may assume that §1182(f) does not allow the President to expressly override particular provisions of the INA. But plaintiffs have not identified any conflict between the statute and the Proclamation that would implicitly bar the President from addressing deficiencies in the Nation's vetting system.

To the contrary, the Proclamation supports Congress's

individualized approach for determining admissibility. The INA sets forth various inadmissibility grounds based on connections to terrorism and criminal history, but those provisions can only work when the consular officer has sufficient (and sufficiently reliable) information to make that determination. The Proclamation promotes the effectiveness of the vetting process by helping to ensure the availability of such information.

Plaintiffs suggest that the entry restrictions are unnecessary because consular officers can simply deny visas in individual cases when an alien fails to carry his burden of proving admissibility—for example, by failing to produce certified records regarding his criminal history. Brief for Respondents 48. But that misses the point: A critical finding of the Proclamation is that the failure of certain countries to provide reliable information prevents the Government from accurately determining whether an alien is inadmissible or poses a threat. Proclamation §1(h). Unless consular officers are expected to apply categorical rules and deny entry from those countries across the board, fraudulent or unreliable documentation may thwart their review in individual cases. And at any rate, the INA certainly does not *require* that systemic problems such as the lack of reliable information be addressed only in a progression of case-by-case admissibility determinations. One of the key objectives of the Proclamation is to encourage foreign governments to improve their practices, thus facilitating the Government's vetting process overall. *Ibid.*

Nor is there a conflict between the Proclamation and the Visa Waiver Program. The Program allows travel without a visa for short-term visitors from 38 countries that have entered into a "rigorous security partnership" with the United States. DHS, U. S. Visa Waiver Program (Apr. 6, 2016), http://www.dhs.gov/visa-waiver-program (as last visited June 25, 2018). Eligibility for that partnership

involves "broad and consequential assessments of [the country's] foreign security standards and operations." *Ibid.* A foreign government must (among other things) undergo a comprehensive evaluation of its "counterterrorism, law enforcement, immigration enforcement, passport security, and border management capabilities," often including "operational site inspections of airports, seaports, land borders, and passport production and issuance facilities." *Ibid.*

Congress's decision to authorize a benefit for "many of America's closest allies," *ibid.*, did not implicitly foreclose the Executive from imposing tighter restrictions on nationals of certain high-risk countries. The Visa Waiver Program creates a special exemption for citizens of countries that maintain exemplary security standards and offer "reciprocal [travel] privileges" to United States citizens. 8 U. S. C. §1187(a)(2)(A). But in establishing a select partnership covering less than 20% of the countries in the world, Congress did not address what requirements should govern the entry of nationals from the vast majority of countries that fall short of that gold standard—particularly those nations presenting heightened terrorism concerns. Nor did Congress attempt to determine—as the multi-agency review process did—whether those high-risk countries provide a minimum baseline of information to adequately vet their nationals. Once again, this is not a situation where "Congress has stepped into the space and solved the exact problem." Tr. of Oral Arg. 53.

Although plaintiffs claim that their reading preserves for the President a flexible power to "supplement" the INA, their understanding of the President's authority is remarkably cramped: He may suspend entry by classes of aliens "similar in nature" to the existing categories of inadmissibility—but not too similar—or only in response to "some exigent circumstance" that Congress did not already touch on in the INA. Brief for Respondents 31, 36,

50; see also Tr. of Oral Arg. 57 ("Presidents have wide berth in this area . . . if there's any sort of emergency."). In any event, no Congress that wanted to confer on the President only a residual authority to address emergency situations would ever use language of the sort in §1182(f). Fairly read, the provision vests authority in the President to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA—including in response to circumstances that might affect the vetting system or other "interests of the United States."

Because plaintiffs do not point to any contradiction with another provision of the INA, the President has not exceeded his authority under §1182(f).

2

Plaintiffs seek to locate additional limitations on the scope of §1182(f) in the statutory background and legislative history. Given the clarity of the text, we need not consider such extra-textual evidence. See *State Farm Fire & Casualty Co.* v. *United States ex rel. Rigsby*, 580 U. S. ___, ___ (2016) (slip op., at 9). At any rate, plaintiffs' evidence supports the plain meaning of the provision.

Drawing on legislative debates over §1182(f), plaintiffs suggest that the President's suspension power should be limited to exigencies where it would be difficult for Congress to react promptly. Precursor provisions enacted during the First and Second World Wars confined the President's exclusion authority to times of "war" and "national emergency." See Act of May 22, 1918, §1(a), 40 Stat. 559; Act of June 21, 1941, ch. 210, §1, 55 Stat. 252. When Congress enacted §1182(f) in 1952, plaintiffs note, it borrowed "nearly verbatim" from those predecessor statutes, and one of the bill's sponsors affirmed that the provision would apply only during a time of crisis. According to plaintiffs, it therefore follows that Congress sought to delegate only a similarly tailored suspension power in

§1182(f). Brief for Respondents 39–40.

If anything, the drafting history suggests the opposite. In borrowing "nearly verbatim" from the pre-existing statute, Congress made one critical alteration—it removed the national emergency standard that plaintiffs now seek to reintroduce in another form. Weighing Congress's conscious departure from its wartime statutes against an isolated floor statement, the departure is far more probative. See *NLRB* v. *SW General, Inc.*, 580 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 16) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."). When Congress wishes to condition an exercise of executive authority on the President's finding of an exigency or crisis, it knows how to say just that. See, *e.g.,* 16 U. S. C. §824*o*–1(b); 42 U. S. C. §5192; 50 U. S. C. §§1701, 1702. Here, Congress instead chose to condition the President's exercise of the suspension authority on a different finding: that the entry of an alien or class of aliens would be "detrimental to the interests of the United States."

Plaintiffs also strive to infer limitations from executive practice. By their count, every previous suspension order under §1182(f) can be slotted into one of two categories. The vast majority targeted discrete groups of foreign nationals engaging in conduct "deemed harmful by the immigration laws." And the remaining entry restrictions that focused on entire nationalities—namely, President Carter's response to the Iran hostage crisis and President Reagan's suspension of immigration from Cuba—were, in their view, designed as a response to diplomatic emergencies "that the immigration laws do not address." Brief for Respondents 40–41.

Even if we were willing to confine expansive language in light of its past applications, the historical evidence is more equivocal than plaintiffs acknowledge. Presidents have repeatedly suspended entry not because the covered

nationals themselves engaged in harmful acts but instead to retaliate for conduct by their governments that conflicted with U. S. foreign policy interests. See, *e.g.,* Exec. Order No. 13662, 3 CFR 233 (2014) (President Obama) (suspending entry of Russian nationals working in the financial services, energy, mining, engineering, or defense sectors, in light of the Russian Federation's "annexation of Crimea and its use of force in Ukraine"); Presidential Proclamation No. 6958, 3 CFR 133 (1997) (President Clinton) (suspending entry of Sudanese governmental and military personnel, citing "foreign policy interests of the United States" based on Sudan's refusal to comply with United Nations resolution). And while some of these reprisals were directed at subsets of aliens from the countries at issue, others broadly suspended entry on the basis of nationality due to ongoing diplomatic disputes. For example, President Reagan invoked §1182(f) to suspend entry "as immigrants" by almost all Cuban nationals, to apply pressure on the Cuban Government. Presidential Proclamation No. 5517, 3 CFR 102 (1986). Plaintiffs try to fit this latter order within their carve-out for emergency action, but the proclamation was based in part on Cuba's decision to breach an immigration agreement some 15 months earlier.

More significantly, plaintiffs' argument about historical practice is a double-edged sword. The more ad hoc their account of executive action—to fit the history into their theory—the harder it becomes to see such a refined delegation in a statute that grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long.

## C

Plaintiffs' final statutory argument is that the President's entry suspension violates §1152(a)(1)(A), which provides that "no person shall . . . be discriminated against

in the issuance of an immigrant visa because of the per-
son's race, sex, nationality, place of birth, or place of
residence." They contend that we should interpret the
provision as prohibiting nationality-based discrimination
throughout the *entire* immigration process, despite the
reference in §1152(a)(1)(A) to the act of visa issuance
alone. Specifically, plaintiffs argue that §1152(a)(1)(A)
applies to the predicate question of a visa applicant's
eligibility for admission and the subsequent question
whether the holder of a visa may in fact enter the country.
Any other conclusion, they say, would allow the President
to circumvent the protections against discrimination
enshrined in §1152(a)(1)(A).

As an initial matter, this argument challenges only the
validity of the entry restrictions on *immigrant* travel.
Section 1152(a)(1)(A) is expressly limited to the issuance
of "immigrant visa[s]" while §1182(f) allows the Presi-
dent to suspend entry of "immigrants or nonimmigrants."
At a minimum, then, plaintiffs' reading would not affect
any of the limitations on nonimmigrant travel in the
Proclamation.

In any event, we reject plaintiffs' interpretation because
it ignores the basic distinction between admissibility
determinations and visa issuance that runs throughout
the INA.[3] Section 1182 defines the pool of individuals who

——————

[3]The Act is rife with examples distinguishing between the two con-
cepts. See, *e.g.,* 8 U. S. C. §1101(a)(4) ("The term 'application for
admission' has reference to the application for admission into the
United States and not to the application for the issuance of an immi-
grant or nonimmigrant visa."); §1182(a) ("ineligible to receive visas and
ineligible to be admitted"); §1182(a)(3)(D)(iii) ("establishes to the
satisfaction of the consular officer when applying for a visa . . . or to the
satisfaction of the Attorney General when applying for admission");
§1182(h)(1)(A)(i) ("alien's application for a visa, admission, or adjust-
ment of status"); §1187 (permitting entry without a visa); §1361 (estab-
lishing burden of proof for when a person "makes application for a visa
. . . , or makes application for admission, or otherwise attempts to enter

are admissible to the United States.  Its restrictions come
into play at two points in the process of gaining entry (or
admission)[4] into the United States.  First, any alien who is
inadmissible under §1182 (based on, for example, health
risks, criminal history, or foreign policy consequences) is
screened out as "ineligible to receive a visa."  8 U. S. C.
§1201(g).  Second, even if a consular officer issues a visa,
entry into the United States is not guaranteed.  As every
visa application explains, a visa does not entitle an alien
to enter the United States "if, upon arrival," an immigra-
tion officer determines that the applicant is "inadmissible
under this chapter, or any other provision of law"—
including §1182(f).  §1201(h).

   Sections 1182(f) and 1152(a)(1)(A) thus operate in dif-
ferent spheres: Section 1182 defines the universe of aliens
who are admissible into the United States (and therefore
eligible to receive a visa).  Once §1182 sets the boundaries
of admissibility into the United States, §1152(a)(1)(A)
prohibits discrimination in the allocation of immigrant
visas based on nationality and other traits.  The distinc-
tion between admissibility—to which §1152(a)(1)(A) does
not apply—and visa issuance—to which it does—is appar-
ent from the text of the provision, which specifies only that
its protections apply to the "issuance" of "immigrant vi-
sa[s]," without mentioning admissibility or entry.  Had
Congress instead intended in §1152(a)(1)(A) to constrain
the President's power to determine who may enter the
country, it could easily have chosen language directed to
that end.  See, *e.g.,* §§1182(a)(3)(C)(ii), (iii) (providing that
certain aliens "*shall not be excludable or subject to re-
strictions or conditions on entry* . . . because of the alien's

—————

the United States").

   [4] The concepts of entry and admission—but not issuance of a visa—
are used interchangeably in the INA.  See §1101(a)(13)(A) (defining
"admission" as the "lawful entry of the alien into the United States").

past, current, or expected beliefs, statements, or associations" (emphasis added)). "The fact that [Congress] did not adopt [a] readily available and apparent alternative strongly supports" the conclusion that §1152(a)(1)(A) does not limit the President's delegated authority under §1182(f). *Knight* v. *Commissioner*, 552 U. S. 181, 188 (2008).

Common sense and historical practice confirm as much. Section 1152(a)(1)(A) has never been treated as a constraint on the criteria for admissibility in §1182. Presidents have repeatedly exercised their authority to suspend entry on the basis of nationality. As noted, President Reagan relied on §1182(f) to suspend entry "as immigrants by all Cuban nationals," subject to exceptions. Proclamation No. 5517, 51 Fed. Reg. 30470 (1986). Likewise, President Carter invoked §1185(a)(1) to deny and revoke visas to all Iranian nationals. See Exec. Order No. 12172, 3 CFR 461 (1979), as amended by Exec. Order No. 12206, 3 CFR 249 (1980); Public Papers of the Presidents, Jimmy Carter, Sanctions Against Iran, Vol. 1, Apr. 7, 1980, pp. 611–612 (1980); see also n. 1, *supra*.

On plaintiffs' reading, those orders were beyond the President's authority. The entry restrictions in the Proclamation on North Korea (which plaintiffs do not challenge in this litigation) would also be unlawful. Nor would the President be permitted to suspend entry from particular foreign states in response to an epidemic confined to a single region, or a verified terrorist threat involving nationals of a specific foreign nation, or even if the United States were on the brink of war.

In a reprise of their §1182(f) argument, plaintiffs attempt to soften their position by falling back on an implicit exception for Presidential actions that are "closely drawn" to address "specific fast-breaking exigencies." Brief for Respondents 60–61. Yet the absence of any textual basis for such an exception more likely indicates that Congress

did not intend for §1152(a)(1)(A) to limit the President's
flexible authority to suspend entry based on foreign policy
interests.  In addition, plaintiffs' proposed exigency test
would require courts, rather than the President, to deter-
mine whether a foreign government's conduct rises to the
level that would trigger a supposed implicit exception
to a federal statute.  See *Reno* v. *American-Arab Anti-
Discrimination Comm.*, 525 U. S. 471, 491 (1999) (explain-
ing that even if the Executive "disclose[d] its . . . reasons
for deeming nationals of a particular country a special
threat," courts would be "unable to assess their adequacy").
The text of §1152(a)(1)(A) offers no standards that would
enable courts to assess, for example, whether the situation
in North Korea justifies entry restrictions while the terror-
ist threat in Yemen does not.

*          *          *

The Proclamation is squarely within the scope of Presi-
dential authority under the INA.  Indeed, neither dissent
even attempts any serious argument to the contrary,
despite the fact that plaintiffs' primary contention below
and in their briefing before this Court was that the Proc-
lamation violated the statute.

## IV

### A

We now turn to plaintiffs' claim that the Proclamation
was issued for the unconstitutional purpose of excluding
Muslims.  Because we have an obligation to assure our-
selves of jurisdiction under Article III, we begin by ad-
dressing the question whether plaintiffs have standing to
bring their constitutional challenge.

Federal courts have authority under the Constitution to
decide legal questions only in the course of resolving
"Cases" or "Controversies."  Art. III, §2.  One of the essen-
tial elements of a legal case or controversy is that the

plaintiff have standing to sue. Standing requires more than just a "keen interest in the issue." *Hollingsworth* v. *Perry*, 570 U. S. 693, 700 (2013). It requires allegations—and, eventually, proof—that the plaintiff "personal[ly]" suffered a concrete and particularized injury in connection with the conduct about which he complains. *Spokeo, Inc.* v. *Robins*, 578 U. S. ___, ___ (2016) (slip op., at 7). In a case arising from an alleged violation of the Establishment Clause, a plaintiff must show, as in other cases, that he is "directly affected by the laws and practices against which [his] complaints are directed." *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 224, n. 9 (1963). That is an issue here because the entry restrictions apply not to plaintiffs themselves but to others seeking to enter the United States.

Plaintiffs first argue that they have standing on the ground that the Proclamation "establishes a disfavored faith" and violates "their own right to be free from federal [religious] establishments." Brief for Respondents 27–28 (emphasis deleted). They describe such injury as "spiritual and dignitary." *Id.*, at 29.

We need not decide whether the claimed dignitary interest establishes an adequate ground for standing. The three individual plaintiffs assert another, more concrete injury: the alleged real-world effect that the Proclamation has had in keeping them separated from certain relatives who seek to enter the country. See *ibid.*; *Town of Chester* v. *Laroe Estates, Inc.*, 581 U. S. ___, ___–___ (2017) (slip op., at 5–6) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint."). We agree that a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact. This Court has previously considered the merits of claims asserted by United States citizens regarding violations of their personal rights allegedly caused by the Government's exclu-

sion of particular foreign nationals.  See *Kerry* v. *Din*, 576
U. S. ___, ___ (2015) (plurality opinion) (slip op., at 15); *id.*,
at ___ (KENNEDY, J., concurring in judgment) (slip op.,
at 1); *Kleindienst* v. *Mandel*, 408 U. S. 753, 762 (1972).
Likewise, one of our prior stay orders in this litigation
recognized that an American individual who has "a bona
fide relationship with a particular person seeking to enter
the country . . . can legitimately claim concrete hardship if
that person is excluded."  *Trump* v. *IRAP*, 582 U. S., at ___
(slip op., at 13).

The Government responds that plaintiffs' Establishment
Clause claims are not justiciable because the Clause does
not give them a legally protected interest in the admission
of particular foreign nationals.  But that argument—which
depends upon the scope of plaintiffs' Establishment Clause
rights—concerns the merits rather than the justiciability
of plaintiffs' claims.  We therefore conclude that the indi-
vidual plaintiffs have Article III standing to challenge the
exclusion of their relatives under the Establishment
Clause.

B

The First Amendment provides, in part, that "Congress
shall make no law respecting an establishment of religion,
or prohibiting the free exercise thereof."  Our cases recog-
nize that "[t]he clearest command of the Establishment
Clause is that one religious denomination cannot be offi-
cially preferred over another."  *Larson* v. *Valente*, 456
U. S. 228, 244 (1982).  Plaintiffs believe that the Procla-
mation violates this prohibition by singling out Muslims
for disfavored treatment.  The entry suspension, they
contend, operates as a "religious gerrymander," in part
because most of the countries covered by the Proclamation
have Muslim-majority populations.  And in their view,
deviations from the information-sharing baseline criteria
suggest that the results of the multi-agency review were

"foreordained." Relying on Establishment Clause precedents concerning laws and policies applied domestically, plaintiffs allege that the primary purpose of the Proclamation was religious animus and that the President's stated concerns about vetting protocols and national security were but pretexts for discriminating against Muslims. Brief for Respondents 69–73.

At the heart of plaintiffs' case is a series of statements by the President and his advisers casting doubt on the official objective of the Proclamation. For example, while a candidate on the campaign trail, the President published a "Statement on Preventing Muslim Immigration" that called for a "total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on." App. 158. That statement remained on his campaign website until May 2017. *Id.,* at 130–131. Then-candidate Trump also stated that "Islam hates us" and asserted that the United States was "having problems with Muslims coming into the country." *Id.,* at 120–121, 159. Shortly after being elected, when asked whether violence in Europe had affected his plans to "ban Muslim immigration," the President replied, "You know my plans. All along, I've been proven to be right." *Id.,* at 123.

One week after his inauguration, the President issued EO–1. In a television interview, one of the President's campaign advisers explained that when the President "first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'" *Id.,* at 125. The adviser said he assembled a group of Members of Congress and lawyers that "focused on, instead of religion, danger. . . . [The order] is based on places where there [is] substantial evidence that people are sending terrorists into our country." *Id.,* at 229.

Plaintiffs also note that after issuing EO–2 to replace

EO–1, the President expressed regret that his prior order had been "watered down" and called for a "much tougher version" of his "Travel Ban." Shortly before the release of the Proclamation, he stated that the "travel ban . . . should be far larger, tougher, and more specific," but "stupidly that would not be politically correct." *Id.,* at 132–133. More recently, on November 29, 2017, the President re-tweeted links to three anti-Muslim propaganda videos. In response to questions about those videos, the President's deputy press secretary denied that the President thinks Muslims are a threat to the United States, explaining that "the President has been talking about these security issues for years now, from the campaign trail to the White House" and "has addressed these issues with the travel order that he issued earlier this year and the companion proclamation." *IRAP* v. *Trump*, 883 F. 3d 233, 267 (CA4 2018).

The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf. Our Presidents have frequently used that power to espouse the principles of religious freedom and tolerance on which this Nation was founded. In 1790 George Washington reassured the Hebrew Congregation of Newport, Rhode Island that "happily the Government of the United States . . . gives to bigotry no sanction, to persecution no assistance [and] requires only that they who live under its protection should demean themselves as good citizens." 6 Papers of George Washington 285 (D. Twohig ed. 1996). President Eisenhower, at the opening of the Islamic Center of Washington, similarly pledged to a Muslim audience that "America would fight with her whole strength for your right to have here your own church," declaring that "[t]his concept is indeed a part of America." Public Papers of the Presidents, Dwight D. Eisenhower, June 28, 1957, p. 509 (1957). And just days after the attacks of September 11, 2001, President George

W. Bush returned to the same Islamic Center to implore his fellow Americans—Muslims and non-Muslims alike—to remember during their time of grief that "[t]he face of terror is not the true faith of Islam," and that America is "a great country because we share the same values of respect and dignity and human worth." Public Papers of the Presidents, George W. Bush, Vol. 2, Sept. 17, 2001, p. 1121 (2001). Yet it cannot be denied that the Federal Government and the Presidents who have carried its laws into effect have—from the Nation's earliest days—performed unevenly in living up to those inspiring words.

Plaintiffs argue that this President's words strike at fundamental standards of respect and tolerance, in violation of our constitutional tradition. But the issue before us is not whether to denounce the statements. It is instead the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility. In doing so, we must consider not only the statements of a particular President, but also the authority of the Presidency itself.

The case before us differs in numerous respects from the conventional Establishment Clause claim. Unlike the typical suit involving religious displays or school prayer, plaintiffs seek to invalidate a national security directive regulating the entry of aliens abroad. Their claim accordingly raises a number of delicate issues regarding the scope of the constitutional right and the manner of proof. The Proclamation, moreover, is facially neutral toward religion. Plaintiffs therefore ask the Court to probe the sincerity of the stated justifications for the policy by reference to extrinsic statements—many of which were made before the President took the oath of office. These various aspects of plaintiffs' challenge inform our standard of review.

C

For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977); see *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 588–589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."). Because decisions in these matters may implicate "relations with foreign powers," or involve "classifications defined in the light of changing political and economic circumstances," such judgments "are frequently of a character more appropriate to either the Legislature or the Executive." *Mathews* v. *Diaz*, 426 U. S. 67, 81 (1976).

Nonetheless, although foreign nationals seeking admission have no constitutional right to entry, this Court has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U. S. citizen. In *Kleindienst* v. *Mandel*, the Attorney General denied admission to a Belgian journalist and self-described "revolutionary Marxist," Ernest Mandel, who had been invited to speak at a conference at Stanford University. 408 U. S., at 756–757. The professors who wished to hear Mandel speak challenged that decision under the First Amendment, and we acknowledged that their constitutional "right to receive information" was implicated. *Id.*, at 764–765. But we limited our review to whether the Executive gave a "facially legitimate and bona fide" reason for its action. *Id.*, at 769. Given the authority of the political branches over admission, we held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justifica-

tion" against the asserted constitutional interests of U. S. citizens. *Id.*, at 770.

The principal dissent suggests that *Mandel* has no bearing on this case, *post,* at 14, and n. 5 (opinion of SOTOMAYOR, J.) (hereinafter the dissent), but our opinions have reaffirmed and applied its deferential standard of review across different contexts and constitutional claims. In *Din*, JUSTICE KENNEDY reiterated that "respect for the political branches' broad power over the creation and administration of the immigration system" meant that the Government need provide only a statutory citation to explain a visa denial. 576 U. S., at \_\_\_ (opinion concurring in judgment) (slip op., at 6). Likewise in *Fiallo*, we applied *Mandel* to a "broad congressional policy" giving immigration preferences to mothers of illegitimate children. 430 U. S., at 795. Even though the statute created a "categorical" entry classification that discriminated on the basis of sex and legitimacy, *post,* at 14, n. 5, the Court concluded that "it is not the judicial role in cases of this sort to probe and test the justifications" of immigration policies. 430 U. S., at 799 (citing *Mandel*, 408 U. S., at 770). Lower courts have similarly applied *Mandel* to broad executive action. See *Rajah* v. *Mukasey*, 544 F. 3d 427, 433, 438–439 (CA2 2008) (upholding National Security Entry-Exit Registration System instituted after September 11, 2001).

*Mandel*'s narrow standard of review "has particular force" in admission and immigration cases that overlap with "the area of national security." *Din*, 576 U. S., at \_\_\_ (KENNEDY, J., concurring in judgment) (slip op., at 3). For one, "[j]udicial inquiry into the national-security realm raises concerns for the separation of powers" by intruding on the President's constitutional responsibilities in the area of foreign affairs. *Ziglar* v. *Abbasi*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 19) (internal quotation marks omitted). For another, "when it comes to collecting evidence and drawing inferences" on questions of national security, "the

lack of competence on the part of the courts is marked."
*Humanitarian Law Project*, 561 U. S., at 34.

The upshot of our cases in this context is clear: "Any
rule of constitutional law that would inhibit the flexibility"
of the President "to respond to changing world conditions
should be adopted only with the greatest caution," and our
inquiry into matters of entry and national security is
highly constrained. *Mathews*, 426 U. S., at 81–82. We
need not define the precise contours of that inquiry in this
case. A conventional application of *Mandel*, asking only
whether the policy is facially legitimate and bona fide,
would put an end to our review. But the Government has
suggested that it may be appropriate here for the inquiry
to extend beyond the facial neutrality of the order. See Tr.
of Oral Arg. 16–17, 25–27 (describing *Mandel* as "the
starting point" of the analysis). For our purposes today,
we assume that we may look behind the face of the Proc-
lamation to the extent of applying rational basis review.
That standard of review considers whether the entry
policy is plausibly related to the Government's stated
objective to protect the country and improve vetting pro-
cesses. See *Railroad Retirement Bd.* v. *Fritz*, 449 U. S.
166, 179 (1980). As a result, we may consider plaintiffs'
extrinsic evidence, but will uphold the policy so long as it
can reasonably be understood to result from a justification
independent of unconstitutional grounds.[5]

———————

[5] The dissent finds "perplexing" the application of rational basis re-
view in this context. *Post,* at 15. But what is far more problematic is
the dissent's assumption that courts should review immigration poli-
cies, diplomatic sanctions, and military actions under the *de novo*
"reasonable observer" inquiry applicable to cases involving holiday
displays and graduation ceremonies. The dissent criticizes application
of a more constrained standard of review as "throw[ing] the Establish-
ment Clause out the window." *Post,* at 16, n. 6. But as the numerous
precedents cited in this section make clear, such a circumscribed
inquiry applies to any constitutional claim concerning the entry of
foreign nationals. See Part IV–C, *supra.* The dissent can cite no

## D

Given the standard of review, it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny. On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a "bare . . . desire to harm a politically unpopular group." *Department of Agriculture* v. *Moreno*, 413 U. S. 528, 534 (1973). In one case, we invalidated a local zoning ordinance that required a special permit for group homes for the intellectually disabled, but not for other facilities such as fraternity houses or hospitals. We did so on the ground that the city's stated concerns about (among other things) "legal responsibility" and "crowded conditions" rested on "an irrational prejudice" against the intellectually disabled. *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 448–450 (1985) (internal quotation marks omitted). And in another case, this Court overturned a state constitutional amendment that denied gays and lesbians access to the protection of antidiscrimination laws. The amendment, we held, was "divorced from any factual context from which we could discern a relationship to legitimate state interests," and "its sheer breadth [was] so discontinuous with the reasons offered for it" that the initiative seemed "inexplicable by anything but animus." *Romer* v. *Evans*, 517 U. S. 620, 632, 635 (1996).

The Proclamation does not fit this pattern. It cannot be said that it is impossible to "discern a relationship to legitimate state interests" or that the policy is "inexplicable by anything but animus." Indeed, the dissent can only attempt to argue otherwise by refusing to apply anything resembling rational basis review. But because there is

---

authority for its proposition that the more free-ranging inquiry it proposes is appropriate in the national security and foreign affairs context.

persuasive evidence that the entry suspension has a legitimate grounding in national security concerns, quite apart from any religious hostility, we must accept that independent justification.

The Proclamation is expressly premised on legitimate purposes: preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices. The text says nothing about religion. Plaintiffs and the dissent nonetheless emphasize that five of the seven nations currently included in the Proclamation have Muslim-majority populations. Yet that fact alone does not support an inference of religious hostility, given that the policy covers just 8% of the world's Muslim population and is limited to countries that were previously designated by Congress or prior administrations as posing national security risks. See 8 U. S. C. §1187(a)(12)(A) (identifying Syria and state sponsors of terrorism such as Iran as "countr[ies] or area[s] of concern" for purposes of administering the Visa Waiver Program); Dept. of Homeland Security, DHS Announces Further Travel Restrictions for the Visa Waiver Program (Feb. 18, 2016) (designating Libya, Somalia, and Yemen as additional countries of concern); see also *Rajah*, 544 F. 3d, at 433, n. 3 (describing how nonimmigrant aliens from Iran, Libya, Somalia, Syria, and Yemen were covered by the National Security Entry-Exit Registration System).

The Proclamation, moreover, reflects the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies. Plaintiffs seek to discredit the findings of the review, pointing to deviations from the review's baseline criteria resulting in the inclusion of Somalia and omission of Iraq. But as the Proclamation explains, in each case the determinations were justified by the distinct conditions in each country. Although Somalia generally satisfies the information-sharing component of the baseline criteria, it "stands apart . . . in the degree to

which [it] lacks command and control of its territory." Proclamation §2(h)(i). As for Iraq, the Secretary of Homeland Security determined that entry restrictions were not warranted in light of the close cooperative relationship between the U. S. and Iraqi Governments and the country's key role in combating terrorism in the region. §1(g). It is, in any event, difficult to see how exempting one of the largest predominantly Muslim countries in the region from coverage under the Proclamation can be cited as evidence of animus toward Muslims.

The dissent likewise doubts the thoroughness of the multi-agency review because a recent Freedom of Information Act request shows that the final DHS report "was a mere 17 pages." *Post,* at 19. Yet a simple page count offers little insight into the actual substance of the final report, much less predecisional materials underlying it. See 5 U. S. C. §552(b)(5) (exempting deliberative materials from FOIA disclosure).

More fundamentally, plaintiffs and the dissent challenge the entry suspension based on their perception of its effectiveness and wisdom. They suggest that the policy is overbroad and does little to serve national security interests. But we cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which "are delicate, complex, and involve large elements of prophecy." *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 111 (1948); see also *Regan* v. *Wald*, 468 U. S. 222, 242–243 (1984) (declining invitation to conduct an "independent foreign policy analysis"). While we of course "do not defer to the Government's reading of the First Amendment," the Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving "sensitive and weighty interests of national security and foreign affairs." *Humanitarian Law Project*, 561 U. S., at

33–34.[6]

Three additional features of the entry policy support the Government's claim of a legitimate national security interest. First, since the President introduced entry restrictions in January 2017, three Muslim-majority countries—Iraq, Sudan, and Chad—have been removed from the list of covered countries. The Proclamation emphasizes that its "conditional restrictions" will remain in force only so long as necessary to "address" the identified "inadequacies and risks," Proclamation Preamble, and §1(h), and establishes an ongoing process to engage covered nations and assess every 180 days whether the entry restrictions should be terminated, §§4(a), (b). In fact, in announcing the termination of restrictions on nationals of Chad, the President also described Libya's ongoing engagement with the State Department and the steps Libya is taking "to improve its practices." Proclamation No. 9723, 83 Fed. Reg. 15939.

Second, for those countries that remain subject to entry restrictions, the Proclamation includes significant exceptions for various categories of foreign nationals. The policy permits nationals from nearly every covered country to travel to the United States on a variety of nonimmigrant visas. See, *e.g.,* §§2(b)–(c), (g), (h) (permitting student and exchange visitors from Iran, while restricting only business and tourist nonimmigrant entry for nationals of Libya and Yemen, and imposing no restrictions on

—————

[6] The dissent recycles much of plaintiffs' §1182(f) argument to assert that "Congress has already erected a statutory scheme that fulfills" the President's stated concern about deficient vetting. *Post,* at 19–21. But for the reasons set forth earlier, Congress has not in any sense "stepped into the space and solved the exact problem." Tr. of Oral Arg. 53. Neither the existing inadmissibility grounds nor the narrow Visa Waiver Program address the failure of certain high-risk countries to provide a minimum baseline of reliable information. See Part III–B–1, *supra.*

nonimmigrant entry for Somali nationals). These carve-outs for nonimmigrant visas are substantial: Over the last three fiscal years—before the Proclamation was in effect—the majority of visas issued to nationals from the covered countries were nonimmigrant visas. Brief for Petitioners 57. The Proclamation also exempts permanent residents and individuals who have been granted asylum. §§3(b)(i), (vi).

Third, the Proclamation creates a waiver program open to all covered foreign nationals seeking entry as immigrants or nonimmigrants. According to the Proclamation, consular officers are to consider in each admissibility determination whether the alien demonstrates that (1) denying entry would cause undue hardship; (2) entry would not pose a threat to public safety; and (3) entry would be in the interest of the United States. §3(c)(i); see also §3(c)(iv) (listing examples of when a waiver might be appropriate, such as if the foreign national seeks to reside with a close family member, obtain urgent medical care, or pursue significant business obligations). On its face, this program is similar to the humanitarian exceptions set forth in President Carter's order during the Iran hostage crisis. See Exec. Order No. 12206, 3 CFR 249; Public Papers of the Presidents, Jimmy Carter, Sanctions Against Iran, at 611–612 (1980) (outlining exceptions). The Proclamation also directs DHS and the State Department to issue guidance elaborating upon the circumstances that would justify a waiver.[7]

---

[7] JUSTICE BREYER focuses on only one aspect of our consideration—the waiver program and other exemptions in the Proclamation. Citing selective statistics, anecdotal evidence, and a declaration from unrelated litigation, JUSTICE BREYER suggests that not enough individuals are receiving waivers or exemptions. *Post,* at 4–8 (dissenting opinion). Yet even if such an inquiry were appropriate under rational basis review, the evidence he cites provides "but a piece of the picture," *post,* at 6, and does not affect our analysis.

Finally, the dissent invokes *Korematsu* v. *United States*, 323 U. S. 214 (1944). Whatever rhetorical advantage the dissent may see in doing so, *Korematsu* has nothing to do with this case. The forcible relocation of U. S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority. But it is wholly inapt to liken that morally repugnant order to a facially neutral policy denying certain foreign nationals the privilege of admission. See *post,* at 26–28. The entry suspension is an act that is well within executive authority and could have been taken by any other President—the only question is evaluating the actions of this particular President in promulgating an otherwise valid Proclamation.

The dissent's reference to *Korematsu*, however, affords this Court the opportunity to make express what is already obvious: *Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—"has no place in law under the Constitution." 323 U. S., at 248 (Jackson, J., dissenting).

\*    \*    \*

Under these circumstances, the Government has set forth a sufficient national security justification to survive rational basis review. We express no view on the soundness of the policy. We simply hold today that plaintiffs have not demonstrated a likelihood of success on the merits of their constitutional claim.

## V

Because plaintiffs have not shown that they are likely to succeed on the merits of their claims, we reverse the grant of the preliminary injunction as an abuse of discretion. *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 32 (2008). The case now returns to the lower courts for such further proceedings as may be appropriate.

Our disposition of the case makes it unnecessary to consider the propriety of the nationwide scope of the injunction issued by the District Court.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–965

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS _v._ HAWAII, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 26, 2018]

JUSTICE KENNEDY, concurring.

I join the Court's opinion in full.

There may be some common ground between the opinions in this case, in that the Court does acknowledge that in some instances, governmental action may be subject to judicial review to determine whether or not it is "inexplicable by anything but animus," _Romer_ v. _Evans_, 517 U. S. 620, 632 (1996), which in this case would be animosity to a religion.   Whether judicial proceedings may properly continue in this case, in light of the substantial deference that is and must be accorded to the Executive in the conduct of foreign affairs, and in light of today's decision, is a matter to be addressed in the first instance on remand. And even if further proceedings are permitted, it would be necessary to determine that any discovery and other preliminary matters would not themselves intrude on the foreign affairs power of the Executive.

In all events, it is appropriate to make this further observation.  There are numerous instances in which the statements and actions of Government officials are not subject to judicial scrutiny or intervention.  That does not mean those officials are free to disregard the Constitution and the rights it proclaims and protects.  The oath that all officials take to adhere to the Constitution is not confined to those spheres in which the Judiciary can correct or even

comment upon what those officials say or do. Indeed, the very fact that an official may have broad discretion, discretion free from judicial scrutiny, makes it all the more imperative for him or her to adhere to the Constitution and to its meaning and its promise.

The First Amendment prohibits the establishment of religion and promises the free exercise of religion. From these safeguards, and from the guarantee of freedom of speech, it follows there is freedom of belief and expression. It is an urgent necessity that officials adhere to these constitutional guarantees and mandates in all their actions, even in the sphere of foreign affairs. An anxious world must know that our Government remains committed always to the liberties the Constitution seeks to preserve and protect, so that freedom extends outward, and lasts.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–965

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* HAWAII, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 26, 2018]

THOMAS, J., concurring.

I join the Court's opinion, which highlights just a few of the many problems with the plaintiffs' claims. There are several more. Section 1182(f) does not set forth any judicially enforceable limits that constrain the President. See *Webster* v. *Doe*, 486 U. S. 592, 600 (1988). Nor could it, since the President has *inherent* authority to exclude aliens from the country. See *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 542–543 (1950); accord, *Sessions* v. *Dimaya*, 584 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (THOMAS, J., dissenting) (slip op., at 13–14). Further, the Establishment Clause does not create an individual right to be free from all laws that a "reasonable observer" views as religious or antireligious. See *Town of Greece* v. *Galloway*, 572 U. S. \_\_\_, \_\_\_ (2014) (THOMAS, J., concurring in part and concurring in judgment) (slip op., at 6); *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 52–53 (2004) (THOMAS, J., concurring in judgment). The plaintiffs cannot raise any other First Amendment claim, since the alleged religious discrimination in this case was directed at aliens abroad. See *United States* v. *Verdugo-Urquidez*, 494 U. S. 259, 265 (1990). And, even on its own terms, the plaintiffs' proffered evidence of anti-Muslim discrimination is unpersuasive.

Merits aside, I write separately to address the remedy

that the plaintiffs sought and obtained in this case. The District Court imposed an injunction that barred the Government from enforcing the President's Proclamation against anyone, not just the plaintiffs. Injunctions that prohibit the Executive Branch from applying a law or policy against anyone—often called "universal" or "nationwide" injunctions—have become increasingly common.[1] District courts, including the one here, have begun imposing universal injunctions without considering their authority to grant such sweeping relief. These injunctions are beginning to take a toll on the federal court system— preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.

I am skeptical that district courts have the authority to enter universal injunctions. These injunctions did not emerge until a century and a half after the founding. And they appear to be inconsistent with longstanding limits on equitable relief and the power of Article III courts. If their popularity continues, this Court must address their legality.

I

If district courts have any authority to issue universal injunctions, that authority must come from a statute or the Constitution. See *Missouri* v. *Jenkins*, 515 U. S. 70

---

[1] "Nationwide injunctions" is perhaps the more common term. But I use the term "universal injunctions" in this opinion because it is more precise. These injunctions are distinctive because they prohibit the Government from enforcing a policy with respect to anyone, including nonparties—not because they have wide geographic breadth. An injunction that was properly limited to the plaintiffs in the case would not be invalid simply because it governed the defendant's conduct nationwide.

124 (1995) (THOMAS, J., concurring). No statute expressly grants district courts the power to issue universal injunctions.[2] So the only possible bases for these injunctions are a generic statute that authorizes equitable relief or the courts' inherent constitutional authority. Neither of those sources would permit a form of injunctive relief that is "[in]consistent with our history and traditions." *Ibid.*

## A

This Court has never treated general statutory grants of equitable authority as giving federal courts a freewheeling power to fashion new forms of equitable remedies. Rather, it has read such statutes as constrained by "the body of law which had been transplanted to this country from the English Court of Chancery" in 1789. *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 105 (1945). As Justice Story explained, this Court's "settled doctrine" under such statutes is that "the remedies in equity are to be administered . . . according to the practice of courts of equity in [England]." *Boyle* v. *Zacharie & Turner*, 6 Pet. 648, 658 (1832). More recently, this Court reiterated that broad statutory grants of equitable authority give federal courts "'an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries.'" *Grupo Mexicano de Desarrollo S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 318 (1999) (Scalia, J.) (quoting *Atlas Life Ins. Co.* v. *W. I. Southern, Inc.*, 306 U. S. 563, 568 (1939)).

---

[2] Even if Congress someday enacted a statute that clearly and expressly authorized universal injunctions, courts would need to consider whether that statute complies with the limits that Article III places on the authority of federal courts. See *infra*, at 7–8.

### B

The same is true of the courts' inherent constitutional authority to grant equitable relief, assuming any such authority exists. See *Jenkins*, 515 U. S., at 124 (THOMAS, J., concurring). This authority is also limited by the traditional rules of equity that existed at the founding.

The scope of the federal courts' equitable authority under the Constitution was a point of contention at the founding, and the "more limited construction" of that power prevailed. *Id.,* at 126. The founding generation viewed equity "with suspicion." *Id.*, at 128. Several anti-Federalists criticized the Constitution's extension of the federal judicial power to "Case[s] in . . . Equity," Art. III, §2, as "giv[ing] the judge a discretionary power." Letters from The Federal Farmer No. XV (Jan. 18, 1788), in 2 The Complete Anti-Federalist 315, 322 (H. Storing ed. 1981). That discretionary power, the anti-Federalists alleged, would allow courts to "explain the constitution according to the reasoning spirit of it, without being confined to the words or letter." Essays of Brutus No. XI (Jan. 31, 1788), in *id.,* at 417, 419–420. The Federalists responded to this concern by emphasizing the limited nature of equity. Hamilton explained that the judiciary would be "bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them." The Federalist No. 78, p. 471 (C. Rossiter ed. 1961) (Federalist). Although the purpose of a court of equity was "to give relief in extraordinary cases, which are exceptions to general rules," "the principles by which that relief is governed are now reduced to a regular system." *Id.* No. 83 at 505 (emphasis deleted).

The Federalists' explanation was consistent with how equity worked in 18th-century England. English courts of equity applied established rules not only when they decided the merits, but also when they fashioned remedies. Like other aspects of equity, "the system of relief adminis-

tered by a court of equity" had been reduced "into a regular science." 3 W. Blackstone, Commentaries on the Laws of England 440–441 (1768) (Blackstone). As early as 1768, Blackstone could state that the "remedy a suitor is entitled to expect" could be determined "as readily and with as much precision, in a court of equity as in a court of law." *Id.,* at 441. Although courts of equity exercised remedial "discretion," that discretion allowed them to deny or tailor a remedy despite a demonstrated violation of a right, not to expand a remedy beyond its traditional scope. See G. Keeton, An Introduction to Equity 117–118 (1938).

In short, whether the authority comes from a statute or the Constitution, district courts' authority to provide equitable relief is meaningfully constrained. This authority must comply with longstanding principles of equity that predate this country's founding.

## II

Universal injunctions do not seem to comply with those principles. These injunctions are a recent development, emerging for the first time in the 1960s and dramatically increasing in popularity only very recently. And they appear to conflict with several traditional rules of equity, as well as the original understanding of the judicial role.

Equity originated in England as a means for the Crown to dispense justice by exercising its sovereign authority. See Adams, The Origins of English Equity, 16 Colum. L. Rev. 87, 91 (1916). Petitions for equitable relief were referred to the Chancellor, who oversaw cases in equity. See 1 S. Symon's, Pomeroy's, Equity Jurisprudence §33 (5th ed. 1941) (Pomeroy); G. McDowell, Equity and the Constitution 24 (1982). The Chancellor's equitable jurisdiction was based on the "reserve of justice in the king." F. Maitland, Equity 3 (2d ed. 1936); see also 1 Pomeroy §33, at 38 (describing the Chancellor's equitable authority as an "extraordinary jurisdiction—that of *Grace*—by delega-

tion" from the King).    Equity allowed the sovereign to
afford discretionary relief to parties where relief would not
have been available under the "rigors of the common law."
*Jenkins*, *supra*, at 127 (opinion of THOMAS, J.).

The English system of equity did not contemplate uni-
versal injunctions.    As an agent of the King, the Chancel-
lor had no authority to enjoin him.    See Bray, Multiple
Chancellors: Reforming the National Injunction, 131 Harv.
L. Rev. 417, 425 (2017) (Bray).    The Chancellor could not
give "any relief against the king, or direct any act to be
done by him, or make any decree disposing of or affecting
his property; not even in cases where he is a royal trus-
tee."    3 Blackstone 428.    The Attorney General could be
sued in Chancery, but not in cases that "'immediately
concerned'" the interests of the Crown.    Bray 425 (citing 1
E. Daniell, The Practice of the High Court of Chancery 138
(2d ed. 1845)).    American courts inherited this tradition.
See J. Story, Commentaries on Equity Pleadings §69
(1838) (Story).

Moreover, as a general rule, American courts of equity
did not provide relief beyond the parties to the case.    If
their injunctions advantaged nonparties, that benefit was
merely incidental.    Injunctions barring public nuisances
were an example.    While these injunctions benefited third
parties, that benefit was merely a consequence of provid-
ing relief to the plaintiff.    Woolhandler & Nelson, Does
History Defeat Standing Doctrine? 102 Mich. L. Rev. 689,
702 (2004) (Woolhandler & Nelson); see *Pennsylvania* v.
*Wheeling & Belmont Bridge Co.*, 13 How. 518, 564 (1852)
(explaining that a private "injury makes [a public nui-
sance] a private nuisance to the injured party").

True, one of the recognized bases for an exercise of
equitable power was the avoidance of "multiplicity of
suits."    Bray 426; accord, 1 Pomeroy §243.    Courts would
employ "bills of peace" to consider and resolve a number of
suits in a single proceeding.    *Id.*, §246.    And some authori-

ties stated that these suits could be filed by one plaintiff on behalf of a number of others. *Id.*, §251. But the "general rule" was that "all persons materially interested . . . in the subject-matter of a suit, are to be made *parties* to it . . . , however numerous they may be, so that there may be a complete decree, which shall bind them all." Story §72, at 61 (emphasis added). And, in all events, these "proto-class action[s]" were limited to a small group of similarly situated plaintiffs having some right in common. Bray 426–427; see also Story §120, at 100 (explaining that such suits were "always" based on "a common interest or a common right").

American courts' tradition of providing equitable relief only to parties was consistent with their view of the nature of judicial power. For most of our history, courts understood judicial power as "fundamentall[y] the power to render judgments in individual cases." *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (THOMAS, J., concurring) (slip op., at 2–3). They did not believe that courts could make federal policy, and they did not view judicial review in terms of "striking down" laws or regulations. See *id.,* at \_\_\_–\_\_\_ (slip op., at 3–4). Misuses of judicial power, Hamilton reassured the people of New York, could not threaten "the general liberty of the people" because courts, at most, adjudicate the rights of "individual[s]." Federalist No. 78, at 466.

The judiciary's limited role was also reflected in this Court's decisions about who could sue to vindicate certain rights. See *Spokeo, Inc.* v. *Robins*, 578 U. S. \_\_\_, \_\_\_–\_\_\_ (2016) (THOMAS, J., concurring) (slip op., at 2–4). A plaintiff could not bring a suit vindicating public rights—*i.e.,* rights held by the community at large—without a showing of some specific injury to himself. *Id.,* at \_\_\_–\_\_\_ (slip op., at 3–4). And a plaintiff could not sue to vindicate the private rights of someone else. See Woolhandler & Nelson 715–716. Such claims were considered to be beyond the

authority of courts. *Id.,* at 711–717.

This Court has long respected these traditional limits on equity and judicial power. See, *e.g., Scott* v. *Donald*, 165 U. S. 107, 115 (1897) (rejecting an injunction based on the theory that the plaintiff "so represents [a] class" whose rights were infringed by a statute as "too conjectural to furnish a safe basis upon which a court of equity ought to grant an injunction"). Take, for example, this Court's decision in *Massachusetts* v. *Mellon*, 262 U. S. 447 (1923). There, a taxpayer sought to enjoin the enforcement of an appropriation statute. The Court noted that this kind of dispute "is essentially a matter of public and not of individual concern." *Id.,* at 487. A general interest in enjoining implementation of an illegal law, this Court explained, provides "no basis . . . for an appeal to the preventive powers of a court of equity." *Ibid.* Courts can review the constitutionality of an act only when "a justiciable issue" requires it to decide whether to "disregard an unconstitutional enactment." *Id.,* at 488. If the statute is unconstitutional, then courts enjoin "not the execution of the statute, but the acts of the official." *Ibid.* Courts cannot issue an injunction based on a mere allegation "that officials of the executive department of the government are executing and will execute an act of Congress asserted to be unconstitutional." *Ibid.* "To do so would be not to decide a judicial controversy." *Id.,* at 488–489.

By the latter half of the 20th century, however, some jurists began to conceive of the judicial role in terms of resolving general questions of legality, instead of addressing those questions only insofar as they are necessary to resolve individual cases and controversies. See Bray 451. That is when what appears to be "the first [universal] injunction in the United States" emerged. Bray 438. In *Wirtz* v. *Baldor Elec. Co.*, 337 F. 2d 518 (CADC 1963), the Court of Appeals for the District of Columbia Circuit addressed a lawsuit challenging the Secretary of Labor's

determination of the prevailing minimum wage for a particular industry. *Id.*, at 520. The D. C. Circuit concluded that the Secretary's determination was unsupported, but remanded for the District Court to assess whether any of the plaintiffs had standing to challenge it. *Id.,* at 521–535. The D. C. Circuit also addressed the question of remedy, explaining that if a plaintiff had standing to sue then "the District Court should enjoin . . . the Secretary's determination with respect to the *entire industry*." *Id.,* at 535 (emphasis added). To justify this broad relief, the D. C. Circuit explained that executive officers should honor judicial decisions "in all cases of essentially the same character." *Id.,* at 534. And it noted that, once a court has decided an issue, it "would ordinarily give the same relief to any individual who comes to it with an essentially similar cause of action." *Ibid.* The D. C. Circuit added that the case was "clearly a proceeding in which those who have standing are here to vindicate the public interest in having congressional enactments properly interpreted and applied." *Id.,* at 534–535.

Universal injunctions remained rare in the decades following *Wirtz.* See Bray 440–445. But recently, they have exploded in popularity. See *id.,* at 457–459. Some scholars have criticized the trend. See generally *id.,* at 457–465; Morley, Nationwide Injunctions, Rule 23(b)(2), and the Remedial Powers of the Lower Courts, 97 B. U. L. Rev. 615, 633–653 (2017); Morley, De Facto Class Actions? Plaintiff- and Defendant-Oriented Injunctions in Voting Rights, Election Law, and Other Constitutional Cases, 39 Harv. J. L. & Pub. Pol'y 487, 521–538 (2016).

No persuasive defense has yet been offered for the practice. Defenders of these injunctions contend that they ensure that individuals who did not challenge a law are treated the same as plaintiffs who did, and that universal injunctions give the judiciary a powerful tool to check the Executive Branch. See Amdur & Hausman, Nationwide

Injunctions and Nationwide Harm, 131 Harv. L. Rev. Forum 49, 51, 54 (2017); Malveaux, Class Actions, Civil Rights, and the National Injunction, 131 Harv. L. Rev. Forum 56, 57, 60–62 (2017). But these arguments do not explain how these injunctions are consistent with the historical limits on equity and judicial power. They at best "boi[l] down to a policy judgment" about how powers ought to be allocated among our three branches of government. *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. ___, ___ (2015) (THOMAS, J., concurring in judgment) (slip op., at 23). But the people already made that choice when they ratified the Constitution.

\* \* \*

In sum, universal injunctions are legally and historically dubious. If federal courts continue to issue them, this Court is dutybound to adjudicate their authority to do so.

# SUPREME COURT OF THE UNITED STATES

_____

## No. 17–965

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* HAWAII, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 26, 2018]

JUSTICE BREYER, with whom JUSTICE KAGAN joins, dissenting.

The question before us is whether Proclamation No. 9645 is lawful. If its promulgation or content was significantly affected by religious animus against Muslims, it would violate the relevant statute or the First Amendment itself. See 8 U. S. C. §1182(f) (requiring "find[ings]" that persons denied entry "would be detrimental to the interests of the United States"); *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520 (1993) (First Amendment); *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. \_\_\_ (2018) (same); *post,* at 2–4 (SOTOMAYOR, J., dissenting). If, however, its sole *ratio decidendi* was one of national security, then it would be unlikely to violate either the statute or the Constitution. Which is it? Members of the Court principally disagree about the answer to this question, *i.e.,* about whether or the extent to which religious animus played a significant role in the Proclamation's promulgation or content.

In my view, the Proclamation's elaborate system of exemptions and waivers can and should help us answer this question. That system provides for case-by-case consideration of persons who may qualify for visas despite the Proclamation's general ban. Those persons include lawful permanent residents, asylum seekers, refugees,

students, children, and numerous others. There are likely
many such persons, perhaps in the thousands. And I
believe it appropriate to take account of their Proclamation-
granted status when considering the Proclamation's
lawfulness. The Solicitor General asked us to consider the
Proclamation "as" it is "written" and "as" it is "applied,"
waivers and exemptions included. Tr. of Oral Arg. 38. He
warned us against considering the Proclamation's lawful-
ness "on the hypothetical situation that [the Proclamation]
is what it isn't," *ibid.,* while telling us that its waiver and
exemption provisions mean what they say: The Proclama-
tion does not exclude individuals from the United States
"if they meet the criteria" for a waiver or exemption. *Id.,*
at 33.

On the one hand, if the Government is applying the
exemption and waiver provisions as written, then its
argument for the Proclamation's lawfulness is strength-
ened. For one thing, the Proclamation then resembles
more closely the two important Presidential precedents on
point, President Carter's Iran order and President
Reagan's Cuba proclamation, both of which contained
similar categories of persons authorized to obtain case-by-
case exemptions. *Ante,* at 36–37; Exec. Order No. 12172,
44 Fed. Reg. 67947 (1979), as amended by Exec. Order No.
12206, 45 Fed. Reg. 24101 (1980); Presidential Proclama-
tion No. 5517, 51 Fed. Reg. 30470 (1986). For another
thing, the Proclamation then follows more closely the basic
statutory scheme, which provides for strict case-by-case
scrutiny of applications. It would deviate from that sys-
tem, not across the board, but where circumstances may
require that deviation.

Further, since the case-by-case exemptions and waivers
apply without regard to the individual's religion, applica-
tion of that system would help make clear that the Proc-
lamation does not deny visas to numerous Muslim indi-
viduals (from those countries) who do not pose a security

threat. And that fact would help to rebut the First Amendment claim that the Proclamation rests upon anti-Muslim bias rather than security need. Finally, of course, the very fact that Muslims from those countries would enter the United States (under Proclamation-provided exemptions and waivers) would help to show the same thing.

On the other hand, if the Government is *not* applying the system of exemptions and waivers that the Proclamation contains, then its argument for the Proclamation's lawfulness becomes significantly weaker. For one thing, the relevant precedents—those of Presidents Carter and Reagan—would bear far less resemblance to the present Proclamation. Indeed, one might ask, if those two Presidents thought a case-by-case exemption system appropriate, what is different about present circumstances that would justify that system's absence?

For another thing, the relevant statute requires that there be "find[ings]" that the grant of visas to excluded persons would be "detrimental to the interests of the United States." §1182(f). Yet there would be no such findings in respect to those for whom the Proclamation itself provides case-by-case examination (followed by the grant of a visa in appropriate cases).

And, perhaps most importantly, if the Government is not applying the Proclamation's exemption and waiver system, the claim that the Proclamation is a "Muslim ban," rather than a "security-based" ban, becomes much stronger. How could the Government successfully claim that the Proclamation rests on security needs if it is excluding Muslims who satisfy the Proclamation's own terms? At the same time, denying visas to Muslims who meet the Proclamation's own security terms would support the view that the Government excludes them for reasons based upon their religion.

Unfortunately there is evidence that supports the sec-

ond possibility, *i.e.,* that the Government is not applying the Proclamation as written. The Proclamation provides that the Secretary of State and the Secretary of Homeland Security "shall coordinate to adopt guidance" for consular officers to follow when deciding whether to grant a waiver. §3(c)(ii). Yet, to my knowledge, no guidance has issued. The only potentially relevant document I have found consists of a set of State Department answers to certain Frequently Asked Questions, but this document simply restates the Proclamation in plain language for visa applicants. It does not provide guidance for consular officers as to how they are to exercise their discretion. See Dept. of State, FAQs on the Presidential Proclamation, https:// travel.state.gov/content/travel/en/us-visas/visa-information-resources/presidential-proclamation-archive/2017-12-04-Presidential-Proclamation.html (all Internet materials as last visited June 25, 2018).

An examination of publicly available statistics also provides cause for concern. The State Department reported that during the Proclamation's first month, two waivers were approved out of 6,555 eligible applicants. Letter from M. Waters, Assistant Secretary Legislative Affairs, to Sen. Van Hollen (Feb. 22, 2018). In its reply brief, the Government claims that number increased from 2 to 430 during the first four months of implementation. Reply Brief 17. That number, 430, however, when compared with the number of pre-Proclamation visitors, accounts for a miniscule percentage of those likely eligible for visas, in such categories as persons requiring medical treatment, academic visitors, students, family members, and others belonging to groups that, when considered as a group (rather than case by case), would not seem to pose security threats.

*Amici* have suggested that there are numerous applicants who could meet the waiver criteria. For instance, the Proclamation anticipates waivers for those with "sig-

nificant business or professional obligations" in the United States, §3(c)(iv)(C), and *amici* identify many scholars who would seem to qualify. Brief for Colleges and Universities as *Amici Curiae* 25–27; Brief for American Council on Education et al. as *Amici Curiae* 20 (identifying more than 2,100 scholars from covered countries); see also Brief for Massachusetts Technology Leadership Council, Inc., as *Amicus Curiae* 14–15 (identifying technology and business leaders from covered countries). The Proclamation also anticipates waivers for those with a "close family member (*e.g.,* a spouse, child, or parent)" in the United States, §3(c)(iv)(D), and *amici* identify many such individuals affected by the Proclamation. Brief for Labor Organizations as *Amici Curiae* 15–18 (identifying children and other relatives of U. S. citizens). The Pars Equality Center identified 1,000 individuals—including parents and children of U. S. citizens—who sought and were denied entry under the Proclamation, hundreds of whom seem to meet the waiver criteria. See Brief for Pars Equality Center et al. as *Amici Curiae* 12–28.

Other data suggest the same. The Proclamation does not apply to asylum seekers or refugees. §§3(b)(vi), 6(e). Yet few refugees have been admitted since the Proclamation took effect. While more than 15,000 Syrian refugees arrived in the United States in 2016, only 13 have arrived since January 2018. Dept. of State, Bureau of Population, Refugees, and Migration, Interactive Reporting, Refugee Processing Center, http://ireports.wrapsnet.org. Similarly few refugees have been admitted since January from Iran (3), Libya (1), Yemen (0), and Somalia (122). *Ibid.*

The Proclamation also exempts individuals applying for several types of nonimmigrant visas: lawful permanent residents, parolees, those with certain travel documents, dual nationals of noncovered countries, and representatives of governments or international organizations. §§3(b)(i)–(v). It places no restrictions on the vast majority

of student and exchange visitors, covering only those from
Syria, which provided 8 percent of student and exchange
visitors from the five countries in 2016. §§2(b)–(h); see
Dept. of State, Report of the Visa Office 2016, Table XVII
Nonimmigrant Visas Issued Fiscal Year 2016 (Visa Report
2016 Table XVII). Visitors from Somalia are eligible for
any type of nonimmigrant visa, subject to "additional
scrutiny." §2(h)(ii). If nonimmigrant visa applications
under the Proclamation resemble those in 2016, 16 per-
cent of visa applicants would be eligible for exemptions.
See Visa Report 2016 Table XVII.

In practice, however, only 258 student visas were issued
to applicants from Iran (189), Libya (29), Yemen (40), and
Somalia (0) in the first three months of 2018. See Dept. of
State, Nonimmigrant Visa Issuances by Nationality, Jan.,
Feb., and Mar. 2018. This is less than a quarter of the
volume needed to be on track for 2016 student visa levels.
And only 40 nonimmigrant visas have been issued to
Somali nationals, a decrease of 65 percent from 2016.
*Ibid.*; see Visa Report 2016 Table XVII. While this is but a
piece of the picture, it does not provide grounds for
confidence.

Anecdotal evidence further heightens these concerns.
For example, one *amicus* identified a child with cerebral
palsy in Yemen. The war had prevented her from receiv-
ing her medication, she could no longer move or speak,
and her doctors said she would not survive in Yemen. Her
visa application was denied. Her family received a form
with a check mark in the box unambiguously confirming
that "'a waiver will not be granted in your case.'" Letter
from L. Blatt to S. Harris, Clerk of Court (May 1, 2018).
But after the child's case was highlighted in an *amicus*
brief before this Court, the family received an update from
the consular officer who had initially denied the waiver. It
turns out, according to the officer, that she had all along
determined that the waiver criteria were met. But, the

officer explained, she could not relay that information at the time because the waiver required review from a supervisor, who had since approved it. The officer said that the family's case was now in administrative processing and that she was attaching a "'revised refusal letter indicating the approval of the waiver.'" *Ibid.* The new form did not actually approve the waiver (in fact, the form contains no box saying "granted"). But a different box was now checked, reading: "'The consular officer is reviewing your eligibility for a waiver under the Proclamation. . . . This can be a lengthy process, and until the consular officer can make an individualized determination of [the relevant] factors, your visa application will remain refused under Section 212(f) [of the Proclamation].'" *Ibid.* One is left to wonder why this second box, indicating continuing review, had not been checked at the outset if in fact the child's case had remained under consideration all along. Though this is but one incident and the child was admitted after considerable international attention in this case, it provides yet more reason to believe that waivers are not being processed in an ordinary way.

Finally, in a pending case in the Eastern District of New York, a consular official has filed a sworn affidavit asserting that he and other officials do not, in fact, have discretion to grant waivers. According to the affidavit, consular officers "were not allowed to exercise that discretion" and "the waiver [process] is merely 'window dressing.'" See Decl. of Christopher Richardson, *Alharbi* v. *Miller*, No. 1:18-cv-2435 (June 1, 2018), pp. 3–4. Another report similarly indicates that the U. S. Embassy in Djibouti, which processes visa applications for citizens of Yemen, received instructions to grant waivers "only in rare cases of imminent danger," with one consular officer reportedly telling an applicant that "'[e]ven for infants, we would need to see some evidence of a congenital heart defect or another medical issue of that degree of difficulty

that . . . would likely lead to the child's developmental
harm or death.'"  Center for Constitutional Rights and the
Rule of Law Clinic, Yale Law School, Window Dressing the
Muslim Ban: Reports of Waivers and Mass Denials from
Yemeni-American Families Stuck in Limbo 18 (2018).

Declarations, anecdotal evidence, facts, and numbers
taken from *amicus* briefs are not judicial factfindings.  The
Government has not had an opportunity to respond, and a
court has not had an opportunity to decide.  But, given the
importance of the decision in this case, the need for assur-
ance that the Proclamation does not rest upon a "Muslim
ban," and the assistance in deciding the issue that an-
swers to the "exemption and waiver" questions may pro-
vide, I would send this case back to the District Court for
further proceedings.  And, I would leave the injunction in
effect while the matter is litigated.  Regardless, the
Court's decision today leaves the District Court free to
explore these issues on remand.

If this Court must decide the question without this
further litigation, I would, on balance, find the evidence of
antireligious bias, including statements on a website
taken down only after the President issued the two execu-
tive orders preceding the Proclamation, along with the
other statements also set forth in JUSTICE SOTOMAYOR's
opinion, a sufficient basis to set the Proclamation aside.
And for these reasons, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–965

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* HAWAII, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 26, 2018]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, dissenting.

The United States of America is a Nation built upon the promise of religious liberty. Our Founders honored that core promise by embedding the principle of religious neutrality in the First Amendment. The Court's decision today fails to safeguard that fundamental principle. It leaves undisturbed a policy first advertised openly and unequivocally as a "total and complete shutdown of Muslims entering the United States" because the policy now masquerades behind a façade of national-security concerns. But this repackaging does little to cleanse Presidential Proclamation No. 9645 of the appearance of discrimination that the President's words have created. Based on the evidence in the record, a reasonable observer would conclude that the Proclamation was motivated by anti-Muslim animus. That alone suffices to show that plaintiffs are likely to succeed on the merits of their Establishment Clause claim. The majority holds otherwise by ignoring the facts, misconstruing our legal precedent, and turning a blind eye to the pain and suffering the Proclamation inflicts upon countless families and individuals, many of whom are United States citizens. Because that troubling result runs contrary to the Constitution and our precedent, I dissent.

I

Plaintiffs challenge the Proclamation on various grounds, both statutory and constitutional. Ordinarily, when a case can be decided on purely statutory grounds, we strive to follow a "prudential rule of avoiding constitutional questions." *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1, 8 (1993). But that rule of thumb is far from categorical, and it has limited application where, as here, the constitutional question proves far simpler than the statutory one. Whatever the merits of plaintiffs' complex statutory claims, the Proclamation must be enjoined for a more fundamental reason: It runs afoul of the Establishment Clause's guarantee of religious neutrality.

A

The Establishment Clause forbids government policies "respecting an establishment of religion." U. S. Const., Amdt. 1. The "clearest command" of the Establishment Clause is that the Government cannot favor or disfavor one religion over another. *Larson* v. *Valente*, 456 U. S. 228, 244 (1982); *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 532 (1993) ("[T]he First Amendment forbids an official purpose to disapprove of a particular religion"); *Edwards* v. *Aguillard*, 482 U. S. 578, 593 (1987) ("The Establishment Clause . . . forbids *alike* the preference of a religious doctrine *or* the prohibition of theory which is deemed antagonistic to a particular dogma" (internal quotation marks omitted)); *Lynch* v. *Donnelly*, 465 U. S. 668, 673 (1984) (noting that the Establishment Clause "forbids hostility toward any [religion]," because "such hostility would bring us into 'war with our national tradition as embodied in the First Amendmen[t]'"); *Epperson* v. *Arkansas*, 393 U. S. 97, 106 (1968) ("[T]he State may not adopt programs or practices . . . which aid or oppose any religion. This prohibition is absolute" (citation and internal quotation marks omitted)). Consistent with

that clear command, this Court has long acknowledged that governmental actions that favor one religion "inevitabl[y]" foster "the hatred, disrespect and even contempt of those who [hold] contrary beliefs." *Engel* v. *Vitale*, 370 U. S. 421, 431 (1962). That is so, this Court has held, because such acts send messages to members of minority faiths "'that they are outsiders, not full members of the political community.'" *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290, 309 (2000). To guard against this serious harm, the Framers mandated a strict "principle of denominational neutrality." *Larson*, 456 U. S., at 246; *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. 687, 703 (1994) (recognizing the role of courts in "safeguarding a principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion").

"When the government acts with the ostensible and predominant purpose" of disfavoring a particular religion, "it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844, 860 (2005). To determine whether plaintiffs have proved an Establishment Clause violation, the Court asks whether a reasonable observer would view the government action as enacted for the purpose of disfavoring a religion. See *id.*, at 862, 866; accord, *Town of Greece* v. *Galloway*, 572 U. S. \_\_\_, \_\_\_ (2014) (plurality opinion) (slip op., at 19).

In answering that question, this Court has generally considered the text of the government policy, its operation, and any available evidence regarding "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by" the

decisionmaker. *Lukumi*, 508 U. S., at 540 (opinion of KENNEDY, J.); *McCreary*, 545 U. S., at 862 (courts must evaluate "text, legislative history, and implementation . . . , or comparable official act" (internal quotation marks omitted)). At the same time, however, courts must take care not to engage in "any judicial psychoanalysis of a drafter's heart of hearts." *Id.*, at 862.

## B

### 1

Although the majority briefly recounts a few of the statements and background events that form the basis of plaintiffs' constitutional challenge, *ante,* at 27–28, that highly abridged account does not tell even half of the story. See Brief for The Roderick & Solange MacArthur Justice Center as *Amicus Curiae* 5–31 (outlining President Trump's public statements expressing animus toward Islam). The full record paints a far more harrowing picture, from which a reasonable observer would readily conclude that the Proclamation was motivated by hostility and animus toward the Muslim faith.

During his Presidential campaign, then-candidate Donald Trump pledged that, if elected, he would ban Muslims from entering the United States. Specifically, on December 7, 2015, he issued a formal statement "calling for a total and complete shutdown of Muslims entering the United States." App. 119. That statement, which remained on his campaign website until May 2017 (several months into his Presidency), read in full:

"Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on. According to Pew Research, among others, there is great hatred towards Americans by large segments of the Muslim population. Most recently, a poll from the Center for Security Policy released data

showing '25% of those polled agreed that violence against Americans here in the United States is justified as a part of the global jihad' and 51% of those polled 'agreed that Muslims in America should have the choice of being governed according to Shariah.' Shariah authorizes such atrocities as murder against nonbelievers who won't convert, beheadings and more unthinkable acts that pose great harm to Americans, especially women.

"Mr. Trum[p] stated, 'Without looking at the various polling data, it is obvious to anybody the hatred is beyond comprehension. Where this hatred comes from and why we will have to determine. Until we are able to determine and understand this problem and the dangerous threat it poses, our country cannot be the victims of the horrendous attacks by people that believe only in Jihad, and have no sense of reason or respect of human life. If I win the election for President, we are going to Make America Great Again.'— Donald J. Trump." *Id.*, at 158; see also *id.*, at 130–131.

On December 8, 2015, Trump justified his proposal during a television interview by noting that President Franklin D. Roosevelt "did the same thing" with respect to the internment of Japanese Americans during World War II. *Id.*, at 120. In January 2016, during a Republican primary debate, Trump was asked whether he wanted to "rethink [his] position" on "banning Muslims from entering the country." *Ibid.* He answered, "No." *Ibid.* A month later, at a rally in South Carolina, Trump told an apocryphal story about United States General John J. Pershing killing a large group of Muslim insurgents in the Philippines with bullets dipped in pigs' blood in the early 1900's. *Id.*, at 163–164. In March 2016, he expressed his belief that "Islam hates us. . . . [W]e can't allow people

coming into this country who have this hatred of the United States . . . [a]nd of people that are not Muslim." *Id.,* at 120–121.  That same month, Trump asserted that "[w]e're having problems with the Muslims, and we're having problems with Muslims coming into the country." *Id.*, at 121.  He therefore called for surveillance of mosques in the United States, blaming terrorist attacks on Muslims' lack of "assimilation" and their commitment to "sharia law." *Ibid.*; *id.*, at 164.  A day later, he opined that Muslims "do not respect us at all" and "don't respect a lot of the things that are happening throughout not only our country, but they don't respect other things." *Ibid.*

As Trump's presidential campaign progressed, he began to describe his policy proposal in slightly different terms. In June 2016, for instance, he characterized the policy proposal as a suspension of immigration from countries "where there's a proven history of terrorism." *Id.*, at 121. He also described the proposal as rooted in the need to stop "importing radical Islamic terrorism to the West through a failed immigration system." *Id.*, at 121–122. Asked in July 2016 whether he was "pull[ing] back from" his pledged Muslim ban, Trump responded, "I actually don't think it's a rollback.  In fact, you could say it's an expansion." *Id.,* at 122–123.  He then explained that he used different terminology because "[p]eople were so upset when [he] used the word Muslim." *Id.,* at 123.

A month before the 2016 election, Trump reiterated that his proposed "Muslim ban" had "morphed into a[n] extreme vetting from certain areas of the world." *Ibid.* Then, on December 21, 2016, President-elect Trump was asked whether he would "rethink" his previous "plans to create a Muslim registry or ban Muslim immigration." *Ibid.*  He replied: "You know my plans.  All along, I've proven to be right." *Ibid.*

On January 27, 2017, one week after taking office, President Trump signed Executive Order No. 13769, 82

Fed. Reg. 8977 (2017) (EO–1), entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States." As he signed it, President Trump read the title, looked up, and said "We all know what that means." App. 124. That same day, President Trump explained to the media that, under EO–1, Christians would be given priority for entry as refugees into the United States. In particular, he bemoaned the fact that in the past, "[i]f you were a Muslim [refugee from Syria] you could come in, but if you were a Christian, it was almost impossible." *Id.,* at 125. Considering that past policy "very unfair," President Trump explained that EO–1 was designed "to help" the Christians in Syria. *Ibid.* The following day, one of President Trump's key advisers candidly drew the connection between EO–1 and the "Muslim ban" that the President had pledged to implement if elected. *Ibid.* According to that adviser, "[W]hen [Donald Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'" *Ibid.*

On February 3, 2017, the United States District Court for the Western District of Washington enjoined the enforcement of EO–1. See *Washington* v. *Trump,* 2017 WL 462040, *3. The Ninth Circuit denied the Government's request to stay that injunction. *Washington* v. *Trump*, 847 F. 3d 1151, 1169 (2017) (*per curiam*). Rather than appeal the Ninth Circuit's decision, the Government declined to continue defending EO–1 in court and instead announced that the President intended to issue a new executive order to replace EO–1.

On March 6, 2017, President Trump issued that new executive order, which, like its predecessor, imposed temporary entry and refugee bans. See Exec. Order No. 13,780, 82 Fed. Reg. 13209 (EO–2). One of the President's senior advisers publicly explained that EO–2 would "have the same basic policy outcome" as EO–1, and that any

changes would address "very technical issues that were
brought up by the court." App. 127. After EO–2 was
issued, the White House Press Secretary told reporters
that, by issuing EO–2, President Trump "continue[d] to
deliver on . . . his most significant campaign promises."
*Id.*, at 130. That statement was consistent with President
Trump's own declaration that "I keep my campaign prom-
ises, and our citizens will be very happy when they see the
result." *Id.*, at 127–128.

Before EO–2 took effect, federal District Courts in Ha-
waii and Maryland enjoined the order's travel and refugee
bans. See *Hawaii* v. *Trump*, 245 F. Supp. 3d 1227, 1239
(Haw. 2017); *International Refugee Assistance Project*
(*IRAP*) v. *Trump*, 241 F. Supp. 3d 539, 566 (Md. 2017).
The Fourth and Ninth Circuits upheld those injunctions in
substantial part. *IRAP* v. *Trump*, 857 F. 3d 554, 606 (CA4
2017) (en banc); *Hawaii* v. *Trump*, 859 F. 3d 741, 789
(CA9 2017) (*per curiam*). In June 2017, this Court granted
the Government's petition for certiorari and issued a *per
curiam* opinion partially staying the District Courts' in-
junctions pending further review. In particular, the Court
allowed EO–2's travel ban to take effect except as to "for-
eign nationals who have a credible claim of a bona fide
relationship with a person or entity in the United States."
*Trump* v. *IRAP*, 582 U. S. ___, ___ (2017) (slip op., at 12).

While litigation over EO–2 was ongoing, President
Trump repeatedly made statements alluding to a desire to
keep Muslims out of the country. For instance, he said at
a rally of his supporters that EO–2 was just a "watered
down version of the first one" and had been "tailor[ed]" at
the behest of "the lawyers." App. 131. He further added
that he would prefer "to go back to the first [executive
order] and go all the way" and reiterated his belief that it
was "very hard" for Muslims to assimilate into Western
culture. *Id.*, at 131–132. During a rally in April 2017,
President Trump recited the lyrics to a song called "The

Snake," a song about a woman who nurses a sick snake back to health but then is attacked by the snake, as a warning about Syrian refugees entering the country. *Id.*, at 132, 163. And in June 2017, the President stated on Twitter that the Justice Department had submitted a "watered down, politically correct version" of the "original Travel Ban" "to S[upreme] C[ourt]."[1] *Id.*, at 132. The President went on to tweet: "People, the lawyers and the courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!" *Id.*, at 132–133. He added: "That's right, we need a TRAVEL BAN for certain DANGEROUS countries, not some politically correct term that won't help us protect our people!" *Id.*, at 133. Then, on August 17, 2017, President Trump issued yet another tweet about Islam, once more referencing the story about General Pershing's massacre of Muslims in the Philippines: "Study what General Pershing . . . did to terrorists when caught. There was no more Radical Islamic Terror for 35 years!" *IRAP* v. *Trump*, 883 F. 3d 233, 267 (CA4 2018) (*IRAP II*) (en banc) (alterations in original).

In September 2017, President Trump tweeted that "[t]he travel ban into the United States should be far larger, tougher and more specific—but stupidly, that would not be politically correct!" App. 133. Later that month, on September 24, 2017, President Trump issued Presidential Proclamation No. 9645, 82 Fed. Reg. 45161 (2017) (Proclamation), which restricts entry of certain nationals from six Muslim-majority countries. On November 29, 2017, President Trump "retweeted" three anti-Muslim videos, entitled "Muslim Destroys a Statue of Virgin Mary!", "Islamist mob pushes teenage boy off roof and beats him to death!", and "Muslim migrant beats up Dutch boy on

————————
[1] According to the White House, President Trump's statements on Twitter are "official statements." App. 133.

crutches!"[2] *IRAP II*, 883 F. 3d, at 267. Those videos were initially tweeted by a British political party whose mission is to oppose "all alien and destructive politic[al] or religious doctrines, including . . . Islam." *Ibid.* When asked about these videos, the White House Deputy Press Secretary connected them to the Proclamation, responding that the "President has been talking about these security issues for years now, from the campaign trail to the White House" and "has addressed these issues with the travel order that he issued earlier this year and the companion proclamation." *Ibid.*

2

As the majority correctly notes, "the issue before us is not whether to denounce" these offensive statements. *Ante,* at 29. Rather, the dispositive and narrow question here is whether a reasonable observer, presented with all "openly available data," the text and "historical context" of the Proclamation, and the "specific sequence of events" leading to it, would conclude that the primary purpose of the Proclamation is to disfavor Islam and its adherents by excluding them from the country. See *McCreary*, 545 U. S., at 862–863. The answer is unquestionably yes.

Taking all the relevant evidence together, a reasonable observer would conclude that the Proclamation was driven primarily by anti-Muslim animus, rather than by the

_____

[2] The content of these videos is highly inflammatory, and their titles are arguably misleading. For instance, the person depicted in the video entitled "Muslim migrant beats up Dutch boy on crutches!" was reportedly not a "migrant," and his religion is not publicly known. See Brief for Plaintiffs in *International Refugee Assistance Project* v. *Trump* as *Amici Curiae* 12, n. 4; P. Baker & E. Sullivan, Trump Shares Inflammatory Anti-Muslim Videos, and Britain's Leader Condemns Them, N. Y. Times, Nov. 29, 2017 ("[A]ccording to local officials, both boys are Dutch"), https://www.nytimes.com/2017/11/29/us/politics/trump-anti-muslim-videos-jayda-fransen.html (all Internet materials as last visited June 25, 2018).

Government's asserted national-security justifications. Even before being sworn into office, then-candidate Trump stated that "Islam hates us," App. 399, warned that "[w]e're having problems with the Muslims, and we're having problems with Muslims coming into the country," *id.*, at 121, promised to enact a "total and complete shut-down of Muslims entering the United States," *id.,* at 119, and instructed one of his advisers to find a "lega[l]" way to enact a Muslim ban, *id.*, at 125.[3] The President continued to make similar statements well after his inauguration, as detailed above, see *supra*, at 6–10.

Moreover, despite several opportunities to do so, President Trump has never disavowed any of his prior statements about Islam.[4] Instead, he has continued to make

————————

[3] The Government urges us to disregard the President's campaign statements. Brief for Petitioners 66–67. But nothing in our precedent supports that blinkered approach. To the contrary, courts must consider "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history." *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 540 (1993) (opinion of KENNEDY, J.). Moreover, President Trump and his advisers have repeatedly acknowledged that the Proclamation and its predecessors are an outgrowth of the President's campaign statements. For example, just last November, the Deputy White House Press Secretary reminded the media that the Proclamation addresses "issues" the President has been talking about "for years," including on "the campaign trail." *IRAP II*, 883 F. 3d 233, 267 (CA4 2018). In any case, as the Fourth Circuit correctly recognized, even without relying on any of the President's campaign statements, a reasonable observer would conclude that the Proclamation was enacted for the impermissible purpose of disfavoring Muslims. *Id.*, at 266, 268.

[4] At oral argument, the Solicitor General asserted that President Trump "made crystal-clear on September 25 that he had no intention of imposing the Muslim ban" and "has praised Islam as one of the great countries [*sic*] of the world." Tr. of Oral Arg. 81. Because the record contained no evidence of any such statement made on September 25th, however, the Solicitor General clarified after oral argument that he actually intended to refer to President Trump's statement during a

remarks that a reasonable observer would view as an unrelenting attack on the Muslim religion and its followers. Given President Trump's failure to correct the reasonable perception of his apparent hostility toward the Islamic faith, it is unsurprising that the President's lawyers have, at every step in the lower courts, failed in their attempts to launder the Proclamation of its discriminatory taint. See *United States* v. *Fordice*, 505 U. S. 717, 746–747 (1992) ("[G]iven an initially tainted policy, it is eminently reasonable to make the [Government] bear the risk of nonpersuasion with respect to intent at some future time, both because the [Government] has created the dispute through its own prior unlawful conduct, and because discriminatory intent does tend to persist through time" (citation omitted)). Notably, the Court recently found less pervasive official expressions of hostility and the failure to disavow them to be constitutionally significant. Cf. *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. ___, ___ (2018) (slip op., at 18) ("The official expressions of hostility to religion in some of the commissioners' comments—comments that were not disavowed at the Commission or by the State at any point in the proceedings that led to the affirmance of the order—

———————

television interview on January 25, 2017. Letter from N. Francisco, Solicitor General, to S. Harris, Clerk of Court (May 1, 2018); Reply Brief 28, n. 8. During that interview, the President was asked whether EO–1 was "the Muslim ban," and answered, "no it's not the Muslim ban." See Transcript: ABC News anchor David Muir interviews President Trump, ABC News, Jan. 25, 2017, http://abcnews.go.com/Politics/ transcript-abc-news-anchor-david-muir-interviews-president/story?id= 45047602. But that lone assertion hardly qualifies as a disavowal of the President's comments about Islam—some of which were spoken after January 25, 2017. Moreover, it strains credulity to say that President Trump's January 25th statement makes "crystal-clear" that he never intended to impose a Muslim ban given that, until May 2017, the President's website displayed the statement regarding his campaign promise to ban Muslims from entering the country.

were inconsistent with what the Free Exercise Clause requires"). It should find the same here.

Ultimately, what began as a policy explicitly "calling for a total and complete shutdown of Muslims entering the United States" has since morphed into a "Proclamation" putatively based on national-security concerns. But this new window dressing cannot conceal an unassailable fact: the words of the President and his advisers create the strong perception that the Proclamation is contaminated by impermissible discriminatory animus against Islam and its followers.

## II

Rather than defend the President's problematic statements, the Government urges this Court to set them aside and defer to the President on issues related to immigration and national security. The majority accepts that invitation and incorrectly applies a watered-down legal standard in an effort to short circuit plaintiffs' Establishment Clause claim.

The majority begins its constitutional analysis by noting that this Court, at times, "has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U. S. citizen." *Ante,* at 30 (citing *Kleindienst* v. *Mandel*, 408 U. S. 753 (1972)). As the majority notes, *Mandel* held that when the Executive Branch provides "a facially legitimate and bona fide reason" for denying a visa, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification." *Id.*, at 770. In his controlling concurrence in *Kerry* v. *Din*, 576 U. S. \_\_\_ (2015), JUSTICE KENNEDY applied *Mandel*'s holding and elaborated that courts can "'look behind' the Government's exclusion of" a foreign national if there is "an affirmative showing of bad faith on the part of the consular officer who denied [the] visa." *Din*, 576 U. S., at \_\_\_ (opinion concurring in judgment)

(slip op., at 5). The extent to which *Mandel* and *Din* apply
at all to this case is unsettled, and there is good reason to
think they do not.[5] Indeed, even the Government agreed
at oral argument that where the Court confronts a situa-
tion involving "all kinds of denigrating comments about" a
particular religion and a subsequent policy that is de-
signed with the purpose of disfavoring that religion but
that "dot[s] all the i's and . . . cross[es] all the t's," *Mandel*
would not "pu[t] an end to judicial review of that set of
facts." Tr. of Oral Arg. 16.

In light of the Government's suggestion "that it may be
appropriate here for the inquiry to extend beyond the
facial neutrality of the order," the majority rightly declines

_____

[5] *Mandel* and *Din* are readily distinguishable from this case for a
number of reasons. First, *Mandel* and *Din* each involved a constitu-
tional challenge to an Executive Branch decision to exclude a single
foreign national under a specific statutory ground of inadmissibility.
*Mandel*, 408 U. S., at 767; *Din*, 576 U. S., at ___ (slip op., at 1). Here,
by contrast, President Trump is not exercising his discretionary author-
ity to determine the admission or exclusion of a particular foreign
national. He promulgated an executive order affecting millions of
individuals on a categorical basis. Second, *Mandel* and *Din* did not
purport to establish the framework for adjudicating cases (like this one)
involving claims that the Executive Branch violated the Establishment
Clause by acting pursuant to an unconstitutional purpose. Applying
*Mandel*'s narrow standard of review to such a claim would run contrary
to this Court's repeated admonition that "[f]acial neutrality is not
determinative" in the Establishment Clause context. *Lukumi*, 508
U. S., at 534. Likewise, the majority's passing invocation of *Fiallo* v.
*Bell*, 430 U. S. 787 (1977), is misplaced. *Fiallo*, unlike this case, ad-
dressed a constitutional challenge to a statute enacted by Congress, not
an order of the President. *Id.,* at 791. *Fiallo*'s application of *Mandel*
says little about whether *Mandel*'s narrow standard of review applies to
the unilateral executive proclamation promulgated under the circum-
stances of this case. Finally, even assuming that *Mandel* and *Din*
apply here, they would not preclude us from looking behind the face of
the Proclamation because plaintiffs have made "an affirmative showing
of bad faith," *Din*, 576 U. S., at ___ (slip op., at 5), by the President who,
among other things, instructed his subordinates to find a "lega[l]" way
to enact a Muslim ban, App. 125; see *supra,* at 4–10.

to apply *Mandel*'s "narrow standard of review" and "assume[s] that we may look behind the face of the Proclamation." *Ante,* at 31–32. In doing so, however, the Court, without explanation or precedential support, limits its review of the Proclamation to rational-basis scrutiny. *Ibid.* That approach is perplexing, given that in other Establishment Clause cases, including those involving claims of religious animus or discrimination, this Court has applied a more stringent standard of review. See, *e.g., McCreary*, 545 U. S., at 860–863; *Larson*, 456 U. S., at 246; *Presbyterian Church in U. S.* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U. S. 440, 449–452 (1969); see also *Colorado Christian Univ.* v. *Weaver*, 534 F. 3d 1245, 1266 (CA10 2008) (McConnell, J.) (noting that, under Supreme Court precedent, laws "involving discrimination on the basis of religion, including interdenominational discrimination, are subject to heightened scrutiny whether they arise under the Free Exercise Clause, the Establishment Clause, or the Equal Protection Clause" (citations omitted)).[6] As explained above, the

––––––––––

[6] The majority chides as "problematic" the importation of Establishment Clause jurisprudence "in the national security and foreign affairs context." *Ante*, at 32–33, n. 5. As the majority sees it, this Court's Establishment Clause precedents do not apply to cases involving "immigration policies, diplomatic sanctions, and military actions." *Ante,* at 32, n. 5. But just because the Court has not confronted the precise situation at hand does not render these cases (or the principles they announced) inapplicable. Moreover, the majority's complaint regarding the lack of direct authority is a puzzling charge, given that the majority itself fails to cite any "authority for its proposition" that a more probing review is inappropriate in a case like this one, where United States citizens allege that the Executive has violated the Establishment Clause by issuing a sweeping executive order motivated by animus. *Ante*, at 33 n. 5; see *supra,* at 14, and n. 5. In any event, even if there is no prior case directly on point, it is clear from our precedent that "[w]hatever power the United States Constitution envisions for the Executive" in the context of national security and foreign affairs, "it most assuredly envisions a role for all three branches

Proclamation is plainly unconstitutional under that heightened standard. See *supra,* at 10–13.

But even under rational-basis review, the Proclamation must fall. That is so because the Proclamation is "'divorced from any factual context from which we could discern a relationship to legitimate state interests,' and 'its sheer breadth [is] so discontinuous with the reasons offered for it'" that the policy is "'inexplicable by anything but animus.'" *Ante,* at 33 (quoting *Romer* v. *Evans*, 517 U. S. 620, 632, 635 (1996)); see also *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 448 (1985) (recognizing that classifications predicated on discriminatory animus can never be legitimate because the Government has no legitimate interest in exploiting "mere negative attitudes, or fear" toward a disfavored group). The President's statements, which the majority utterly fails to address in its legal analysis, strongly support the conclusion that the Proclamation was issued to express hostility toward Muslims and exclude them from the country. Given the overwhelming record evidence of anti-Muslim animus, it simply cannot be said that the Proclamation has a legitimate basis. *IRAP II*, 883 F. 3d, at 352 (Harris, J., concurring) (explaining that the Proclamation contravenes the bedrock principle "that the government may not act on the basis of

--------

when individual liberties are at stake." *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 536 (2004) (plurality opinion). This Court's Establishment Clause precedents require that, if a reasonable observer would understand an executive action to be driven by discriminatory animus, the action be invalidated. See *McCreary*, 545 U. S., at 860. That reasonable-observer inquiry includes consideration of the Government's asserted justifications for its actions. The Government's invocation of a national-security justification, however, does not mean that the Court should close its eyes to other relevant information. Deference is different from unquestioning acceptance. Thus, what is "far more problematic" in this case is the majority's apparent willingness to throw the Establishment Clause out the window and forgo any meaningful constitutional review at the mere mention of a national-security concern. *Ante,* at 32, n. 5.

*animus* toward a disfavored religious minority" (emphasis in original)).

The majority insists that the Proclamation furthers two interrelated national-security interests: "preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices." *Ante,* at 34. But the Court offers insufficient support for its view "that the entry suspension has a legitimate grounding in [those] national security concerns, quite apart from any religious hostility." *Ibid.*; see also *ante*, at 33–38, and n. 7. Indeed, even a cursory review of the Government's asserted national-security rationale reveals that the Proclamation is nothing more than a "'religious gerrymander.'" *Lukumi*, 508 U. S., at 535.

The majority first emphasizes that the Proclamation "says nothing about religion." *Ante,* at 34. Even so, the Proclamation, just like its predecessors, overwhelmingly targets Muslim-majority nations. Given the record here, including all the President's statements linking the Proclamation to his apparent hostility toward Muslims, it is of no moment that the Proclamation also includes minor restrictions on two non-Muslim majority countries, North Korea and Venezuela, or that the Government has removed a few Muslim-majority countries from the list of covered countries since EO–1 was issued. Consideration of the entire record supports the conclusion that the inclusion of North Korea and Venezuela, and the removal of other countries, simply reflect subtle efforts to start "talking territory instead of Muslim," App. 123, precisely so the Executive Branch could evade criticism or legal consequences for the Proclamation's otherwise clear targeting of Muslims. The Proclamation's effect on North Korea and Venezuela, for example, is insubstantial, if not entirely symbolic. A prior sanctions order already restricts entry of North Korean nationals, see Exec. Order No. 13810, 82 Fed. Reg. 44705 (2017), and the Proclamation targets only

a handful of Venezuelan government officials and their immediate family members, 82 Fed. Reg. 45166. As such, the President's inclusion of North Korea and Venezuela does little to mitigate the anti-Muslim animus that permeates the Proclamation.

The majority next contends that the Proclamation "reflects the results of a worldwide review process undertaken by multiple Cabinet officials." *Ante,* at 34. At the outset, there is some evidence that at least one of the individuals involved in that process may have exhibited bias against Muslims. As noted by one group of *amici*, the Trump administration appointed Frank Wuco to help enforce the President's travel bans and lead the multiagency review process. See Brief for Plaintiffs in *International Refugee Assistance Project* v. *Trump* as *Amici Curiae* 13–14, and n. 10. According to *amici*, Wuco has purportedly made several suspect public statements about Islam: He has "publicly declared that it was a 'great idea' to 'stop the visa application process into this country from Muslim nations in a blanket type of policy,'" "that Muslim populations 'living under other-than-Muslim rule' will 'necessarily' turn to violence, that Islam prescribes 'violence and warfare against unbelievers,' and that Muslims 'by-and-large . . . resist assimilation.'" *Id.,* at 14.

But, even setting aside those comments, the worldwide review does little to break the clear connection between the Proclamation and the President's anti-Muslim statements. For "[n]o matter how many officials affix their names to it, the Proclamation rests on a rotten foundation." Brief for Constitutional Law Scholars as *Amici Curiae* 7 (filed Apr. 2, 2018); see *supra*, at 4–10. The President campaigned on a promise to implement a "total and complete shutdown of Muslims" entering the country, translated that campaign promise into a concrete policy, and made several statements linking that policy (in its various forms) to anti-Muslim animus.

Ignoring all this, the majority empowers the President to hide behind an administrative review process that the Government refuses to disclose to the public. See *IRAP II*, 883 F. 3d, at 268 ("[T]he Government chose not to make the review publicly available" even in redacted form); *IRAP* v. *Trump*, No. 17–2231 (CA4), Doc. 126 (Letter from S. Swingle, Counsel for Defendants-Appellants, to P. Connor, Clerk of the United States Court of Appeals for the Fourth Circuit (Nov. 24, 2017)) (resisting Fourth Circuit's request that the Government supplement the record with the reports referenced in the Proclamation). Furthermore, evidence of which we can take judicial notice indicates that the multiagency review process could not have been very thorough. Ongoing litigation under the Freedom of Information Act shows that the September 2017 report the Government produced after its review process was a mere 17 pages. See *Brennan Center for Justice* v. *United States Dept. of State*, No. 17–cv–7520 (SDNY), Doc. No. 31–1, pp. 2–3. That the Government's analysis of the vetting practices of hundreds of countries boiled down to such a short document raises serious questions about the legitimacy of the President's proclaimed national-security rationale.

Beyond that, Congress has already addressed the national-security concerns supposedly undergirding the Proclamation through an "extensive and complex" framework governing "immigration and alien status." *Arizona* v. *United States*, 567 U. S. 387, 395 (2012).[7] The Immigra-

_____

[7] It is important to note, particularly given the nature of this case, that many consider "using the term 'alien' to refer to other human beings" to be "offensive and demeaning." *Flores* v. *United States Citizenship & Immigration Servs.*, 718 F. 3d 548, 551–552, n. 1 (CA6 2013). I use the term here only where necessary "to be consistent with the statutory language" that Congress has chosen and "to avoid any confusion in replacing a legal term of art with a more appropriate term." *Ibid.*

tion and Nationality Act sets forth, in painstaking detail, a reticulated scheme regulating the admission of individuals to the United States. Generally, admission to the United States requires a valid visa or other travel document. 8 U. S. C. §§1181, 1182(a)(7)(A)(i)(I), 1182(a)(7)(B)(i)(II). To obtain a visa, an applicant must produce "certified cop[ies]" of documents proving her identity, background, and criminal history. §§1202(b), 1202(d). An applicant also must undergo an in-person interview with a State Department consular officer. §§1201(a)(1), 1202(h)(1), 22 CFR §§42.62(a)–(b) (2017); see also 8 U. S. C. §§1202(h)(2)(D), 1202(h)(2)(F) (requiring in-person interview if the individual "is a national of a country officially designated by the Secretary of State as a state sponsor of terrorism" or is "a member of a group or section that . . . poses a security threat to the United States"). "Any alien who . . . has engaged in a terrorist activity," "incited terrorist activity," or been a representative, member, or endorser of a terrorist organization, or who "is likely to engage after entry in any terrorist activity," §1182(a)(3)(B), or who has committed one or more of the many crimes enumerated in the statute is inadmissible and therefore ineligible to receive a visa. See §1182(a)(2)(A) (crime of moral turpitude or drug offense); §1182(a)(2)(C) (drug trafficking or benefiting from a relative who recently trafficked drugs); §1182(a)(2)(D) (prostitution or "unlawful commercialized vice"); §1182(a)(2)(H) (human trafficking); §1182(a)(3) ("Security and related grounds").

In addition to vetting rigorously any individuals seeking admission to the United States, the Government also rigorously vets the information-sharing and identity-management systems of other countries, as evidenced by the Visa Waiver Program, which permits certain nationals from a select group of countries to skip the ordinary visa-application process. See §1187. To determine which

countries are eligible for the Visa Waiver Program, the Government considers whether they can satisfy numerous criteria—*e.g.,* using electronic, fraud-resistant passports, §1187(a)(3)(B), 24-hour reporting of lost or stolen passports, §1187(c)(2)(D), and not providing a safe haven for terrorists, §1187(a)(12)(D)(iii). The Secretary of Homeland Security, in consultation with the Secretary of State, also must determine that a country's inclusion in the program will not compromise "the law enforcement and security interests of the United States." §1187(c)(2)(C). Eligibility for the program is reassessed on an annual basis. See §1187(a)(12)(D)(iii), 1187(c)(12)(A). As a result of a recent review, for example, the Executive decided in 2016 to remove from the program dual nationals of Iraq, Syria, Iran, and Sudan. See Brief for Former National Security Officials as *Amici Curiae* 27.

Put simply, Congress has already erected a statutory scheme that fulfills the putative national-security interests the Government now puts forth to justify the Proclamation. Tellingly, the Government remains wholly unable to articulate any credible national-security interest that would go unaddressed by the current statutory scheme absent the Proclamation. The Government also offers no evidence that this current vetting scheme, which involves a highly searching consideration of individuals required to obtain visas for entry into the United States and a highly searching consideration of which countries are eligible for inclusion in the Visa Waiver Program, is inadequate to achieve the Proclamation's proclaimed objectives of "preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their [vetting and information-sharing] practices." *Ante,* at 34.

For many of these reasons, several former national-security officials from both political parties—including former Secretary of State Madeleine Albright, former State Department Legal Adviser John Bellinger III, for-

mer Central Intelligence Agency Director John Brennan, and former Director of National Intelligence James Clapper—have advised that the Proclamation and its predecessor orders "do not advance the national-security or foreign policy interests of the United States, and in fact do serious harm to those interests." Brief for Former National Security Officials as *Amici Curiae* 15 (boldface deleted).

Moreover, the Proclamation purports to mitigate national-security risks by excluding nationals of countries that provide insufficient information to vet their nationals. 82 Fed. Reg. 45164. Yet, as plaintiffs explain, the Proclamation broadly denies immigrant visas to all nationals of those countries, including those whose admission would likely not implicate these information deficiencies (*e.g.,* infants, or nationals of countries included in the Proclamation who are long-term residents of and traveling from a country not covered by the Proclamation). See Brief for Respondents 72. In addition, the Proclamation permits certain nationals from the countries named in the Proclamation to obtain nonimmigrant visas, which undermines the Government's assertion that it does not already have the capacity and sufficient information to vet these individuals adequately. See 82 Fed. Reg. 45165–45169.

Equally unavailing is the majority's reliance on the Proclamation's waiver program. *Ante,* at 37, and n. 7. As several *amici* thoroughly explain, there is reason to suspect that the Proclamation's waiver program is nothing more than a sham. See Brief for Pars Equality Center et al. as *Amici Curiae* 11, 13–28 (explaining that "waivers under the Proclamation are vanishingly rare" and reporting numerous stories of deserving applicants denied waivers). The remote possibility of obtaining a waiver pursuant to an ad hoc, discretionary, and seemingly arbitrary process scarcely demonstrates that the Proclamation is rooted in a genuine concern for national security. See *ante,* at 3–8 (BREYER, J., dissenting) (outlining evidence

suggesting "that the Government is not applying the Proclamation as written," that "waivers are not being processed in an ordinary way," and that consular and other officials "do not, in fact, have discretion to grant waivers").

In sum, none of the features of the Proclamation highlighted by the majority supports the Government's claim that the Proclamation is genuinely and primarily rooted in a legitimate national-security interest. What the unrebutted evidence actually shows is that a reasonable observer would conclude, quite easily, that the primary purpose and function of the Proclamation is to disfavor Islam by banning Muslims from entering our country.

### III

As the foregoing analysis makes clear, plaintiffs are likely to succeed on the merits of their Establishment Clause claim. To obtain a preliminary injunction, however, plaintiffs must also show that they are "likely to suffer irreparable harm in the absence of preliminary relief," that "the balance of equities tips in [their] favor," and that "an injunction is in the public interest." *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 20 (2008). Plaintiffs readily clear those remaining hurdles.

First, plaintiffs have shown a likelihood of irreparable harm in the absence of an injunction. As the District Court found, plaintiffs have adduced substantial evidence showing that the Proclamation will result in "a multitude of harms that are not compensable with monetary damages and that are irreparable—among them, prolonged separation from family members, constraints to recruiting and retaining students and faculty members to foster diversity and quality within the University community, and the diminished membership of the [Muslim] Association." 265 F. Supp. 3d 1140, 1159 (Haw. 2017).

Second, plaintiffs have demonstrated that the balance of

the equities tips in their favor.  Against plaintiffs' concrete
allegations of serious harm, the Government advances
only nebulous national-security concerns.  Although na-
tional security is unquestionably an issue of paramount
public importance, it is not "a talisman" that the Govern-
ment can use "to ward off inconvenient claims—a 'label'
used to 'cover a multitude of sins.'" *Ziglar* v. *Abbasi*, 582
U. S. ___, ___ (2017) (slip op., at 20).  That is especially
true here, because, as noted, the Government's other
statutory tools, including the existing rigorous individual-
ized vetting process, already address the Proclamation's
purported national-security concerns.  See *supra,* at 19–
22.

   Finally, plaintiffs and their *amici* have convincingly
established that "an injunction is in the public interest."
*Winter*, 555 U. S., at 20.  As explained by the scores of
*amici* who have filed briefs in support of plaintiffs, the
Proclamation has deleterious effects on our higher educa-
tion system;[8] national security;[9] healthcare;[10] artistic
culture;[11] and the Nation's technology industry and overall
economy.[12]  Accordingly, the Court of Appeals correctly
affirmed, in part, the District Court's preliminary
injunction.[13]

——————

   [8] See Brief for American Council on Education et al. as *Amici Curiae*;
Brief for Colleges and Universities as *Amici Curiae*; Brief for New York
University as *Amicus Curiae*.

   [9] See Brief for Retired Generals and Admirals of the U. S. Armed
Forces as *Amici Curiae*; Brief for Former National Security Officials as
*Amici Curiae*.

   [10] See Brief for Association of American Medical Colleges as *Amicus
Curiae*.

   [11] See Brief for Association of Art Museum Directors et al. as *Amici
Curiae*.

   [12] See Brief for U. S. Companies as *Amici Curiae*; Brief for Massachu-
setts Technology Leadership Council, Inc., as *Amicus Curiae*.

   [13] Because the majority concludes that plaintiffs have failed to show a
likelihood of success on the merits, it takes no position on "the propriety

## IV

The First Amendment stands as a bulwark against official religious prejudice and embodies our Nation's deep commitment to religious plurality and tolerance. That constitutional promise is why, "[f]or centuries now, people have come to this country from every corner of the world to share in the blessing of religious freedom." *Town of Greece* v. *Galloway*, 572 U. S., at \_\_\_ (KAGAN, J., dissenting) (slip op., at 1). Instead of vindicating those principles, today's decision tosses them aside. In holding that the First Amendment gives way to an executive policy that a reasonable observer would view as motivated by animus against Muslims, the majority opinion upends this Court's precedent, repeats tragic mistakes of the past, and denies countless individuals the fundamental right of religious liberty.

Just weeks ago, the Court rendered its decision in *Masterpiece Cakeshop*, 584 U. S. \_\_\_, which applied the bedrock principles of religious neutrality and tolerance in considering a First Amendment challenge to government action. See *id.,* at \_\_\_ (slip op., at 17) ("The Constitution 'commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures'" (quoting *Lukumi*, 508 U. S., at 547)); *Masterpiece*, 584

_____

of the nationwide scope of the injunction issued by the District Court." *Ante,* at 39. The District Court did not abuse its discretion by granting nationwide relief. Given the nature of the Establishment Clause violation and the unique circumstances of this case, the imposition of a nationwide injunction was "'necessary to provide complete relief to the plaintiffs.'" *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 765 (1994); see *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class").

U. S., at ___ (KAGAN, J., concurring) (slip op., at 1)
("[S]tate actors cannot show hostility to religious views;
rather, they must give those views 'neutral and respectful
consideration'").   Those principles should apply equally
here.   In both instances, the question is whether a gov-
ernment actor exhibited tolerance and neutrality in reach-
ing a decision that affects individuals' fundamental reli-
gious freedom.   But unlike in *Masterpiece*, where a state
civil rights commission was found to have acted without
"the neutrality that the Free Exercise Clause requires,"
*id.,* at ___ (slip op., at 17), the government actors in this
case will not be held accountable for breaching the First
Amendment's guarantee of religious neutrality and toler-
ance.   Unlike in *Masterpiece*, where the majority consid-
ered the state commissioners' statements about religion to
be persuasive evidence of unconstitutional government
action, *id.,* at ___–___ (slip op., at 12–14), the majority
here completely sets aside the President's charged state-
ments about Muslims as irrelevant.   That holding erodes
the foundational principles of religious tolerance that the
Court elsewhere has so emphatically protected, and it tells
members of minority religions in our country "'that they
are outsiders, not full members of the political commu-
nity.'"  *Santa Fe*, 530 U. S., at 309.

Today's holding is all the more troubling given the stark
parallels between the reasoning of this case and that of
*Korematsu* v. *United States*, 323 U. S. 214 (1944).   See
Brief for Japanese American Citizens League as *Amicus
Curiae*.   In *Korematsu*, the Court gave "a pass [to] an
odious, gravely injurious racial classification" authorized
by an executive order.   *Adarand Constructors, Inc.* v.
*Peña*, 515 U. S. 200, 275 (1995) (GINSBURG, J., dissenting).
As here, the Government invoked an ill-defined national-
security threat to justify an exclusionary policy of sweep-
ing proportion.   See Brief for Japanese American Citizens
League as *Amicus Curiae* 12–14.   As here, the exclusion

order was rooted in dangerous stereotypes about, *inter alia*, a particular group's supposed inability to assimilate and desire to harm the United States. See *Korematsu*, 323 U. S., at 236–240 (Murphy, J., dissenting). As here, the Government was unwilling to reveal its own intelligence agencies' views of the alleged security concerns to the very citizens it purported to protect. Compare *Korematsu* v. *United States*, 584 F. Supp. 1406, 1418–1419 (ND Cal. 1984) (discussing information the Government knowingly omitted from report presented to the courts justifying the executive order); Brief for Japanese American Citizens League as *Amicus Curiae* 17–19, with *IRAP II*, 883 F. 3d, at 268; Brief for Karen Korematsu et al. as *Amici Curiae* 35–36, and n. 5 (noting that the Government "has gone to great lengths to shield [the Secretary of Homeland Security's] report from view"). And as here, there was strong evidence that impermissible hostility and animus motivated the Government's policy.

Although a majority of the Court in *Korematsu* was willing to uphold the Government's actions based on a barren invocation of national security, dissenting Justices warned of that decision's harm to our constitutional fabric. Justice Murphy recognized that there is a need for great deference to the Executive Branch in the context of national security, but cautioned that "it is essential that there be definite limits to [the government's] discretion," as "[i]ndividuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support." 323 U. S., at 234 (Murphy, J., dissenting). Justice Jackson lamented that the Court's decision upholding the Government's policy would prove to be "a far more subtle blow to liberty than the promulgation of the order itself," for although the executive order was not likely to be long lasting, the Court's willingness to tolerate it would endure. *Id.,* at 245–246.

In the intervening years since *Korematsu*, our Nation has done much to leave its sordid legacy behind. See, *e.g.,* Civil Liberties Act of 1988, 50 U. S. C. App. §4211 *et seq.* (setting forth remedies to individuals affected by the executive order at issue in *Korematsu*); Non-Detention Act of 1971, 18 U. S. C. §4001(a) (forbidding the imprisonment or detention by the United States of any citizen absent an Act of Congress). Today, the Court takes the important step of finally overruling *Korematsu*, denouncing it as "gravely wrong the day it was decided." *Ante,* at 38 (citing *Korematsu*, 323 U. S., at 248 (Jackson, J., dissenting)). This formal repudiation of a shameful precedent is laudable and long overdue. But it does not make the majority's decision here acceptable or right. By blindly accepting the Government's misguided invitation to sanction a discriminatory policy motivated by animosity toward a disfavored group, all in the name of a superficial claim of national security, the Court redeploys the same dangerous logic underlying *Korematsu* and merely replaces one "gravely wrong" decision with another. *Ante,* at 38.

Our Constitution demands, and our country deserves, a Judiciary willing to hold the coordinate branches to account when they defy our most sacred legal commitments. Because the Court's decision today has failed in that respect, with profound regret, I dissent.